WILLIAM T. RUPERT
P.O. Box 66403
Scotts Valley, CA 95067-6403
Phone: (831) 336-9520
Fax:     (831) 336-9528
Email: emfwtr@comcast.net

Plaintiff
Pro Se

**Filed**

JUL 2 3 2009

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

|  |  |
|---|---|
| WILLIAM T. RUPERT,<br>An individual,<br><br>                    Plaintiff,<br><br>          vs.<br><br>SUSAN BOND, an individual; GILE R.<br>DOWNES, ESQ., an individual; IRENE E.<br>RUPERT, an individual; SCHULTE,<br>ANDERSON, DOWNES, ARONSON &<br>BITTNER, P.C., a Professional Corporation;<br>and DOES 1 to 20,<br><br>                    Defendants. | **Civil Action No.: 5:09-cv-02758 JF (RS)** |

## 1ˢᵀ AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF:

1.   Intentional Interference With Economic Relations  (Prospective Inheritance And Lost Successor Trustee Compensation);

2.   Conspiracy To Interfere With Economic Relations;

3.   Punitive Damages;

4.   Declaratory Relief.

1

## JURISDICTION AND VENUE

1.     This is an action for tort damages and declaratory relief. The damages are sought for the intentional interference with plaintiff's economic relations (prospective inheritance and lost successor trustee compensation), and conspiracy to interfere, which concerns damages which were inflicted upon a California resident, the plaintiff, while he was residing in Santa Cruz County, by residents of Oregon and which is being brought under the provisions of 28 USC § 1332(a)(1) due to the diversity of the parties in the action. The related declaratory relief action is being brought under the provisions of 28 USC §§ 2201 & 2202, and it asks the Court to settle the controversies that have developed in the aftermath of the death of Samuel J. Rupert, on October 12, 2008, concerning: (1) who is legally entitled to obtain information concerning the assets and administration of his Trust (under his estate plans which were created in Michigan); (2) who is entitled, at this time, to administer his Estate and Trust; and, (3) who is legally entitled, at this time, to administer the separate Estate and Trust of his wife and companion of 67 years, defendant IRENE E. RUPERT (under her estate plans that involve documents created under Michigan Law and conflicting documents created more recently under Oregon Law), who most definitely requires assistance with her financial affairs because of her failing memory and Alzheimer's Disease, now that Samuel J. Rupert is no longer available to manage and supervise their joint financial affairs, as he did throughout their 67 year marriage. Pursuant to 28 USC § 1391(a)(2), venue is proper in this District. Plaintiff WILLIAM RUPERT is a citizen and resident of the State of California and defendants IRENE E. RUPERT, SUSAN BOND, GILE R. DOWNES, and SCHULTE, ANDERSON, DOWNES, ARONSON & BITTNER, P.C., are all citizens and residents of the State of Oregon. The matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

## INTRADISTRICT ASSIGNMENT

2.     The San Jose Division is the appropriate location in the Northern District of California, pursuant to Civil Local Rule 3-2(e) because significant and substantial events, including the damages inflicted upon the plaintiff, occurred in Santa Cruz County.

## PARTIES

3.     Plaintiff WILLIAM T. RUPERT ("WILLIAM"), is a resident of the town of Ben Lomond, in Santa Cruz County, California and is a 61 year old carpenter/independent paralegal, who is the second born, and middle child, of Samuel J. Rupert, Deceased, and his wife, defendant IRENE E. RUPERT .

4.     Defendant SUSAN BOND ("SUSAN "), is a resident of Portland, Oregon, and a 65 year old designer/renovator/homemaker, who is the first born child of Samuel J. Rupert, Deceased, and his wife, defendant IRENE E. RUPERT.

5.     Defendant IRENE E. RUPERT ("IRENE"), is a current resident of Portland, Oregon, after spending most of her adult life in Ann Arbor, Michigan, where her and her late husband's initial estate planning documents were prepared in 1995 and amended in 2004. She is a 90 year old  widow, with a variety of physical ailments and a failing memory, who has been diagnosed as suffering from the onset of Alzheimer's Disease.

6.     Defendant GILE R. DOWNES, ("DOWNES"), is a resident of Portland, Oregon and an attorney at law licensed to practice in the State of Oregon.  Defendant SUSAN caused DOWNES to be employed, beginning around May 20, 2009, for the purpose of responding to a series of probing letters which the plaintiff had sent to SUSAN, seeking documentary proof of SUSAN'S credentials to function as the successor trustee (instead of the plaintiff), and concerning SUSAN'S administration of the trust, without a proper

accounting, following the death of Samuel J. Rupert, on October 12, 2008. Her joint

administration of the trust assets, for both trusts, included the disposal of significant trust

assets (high-yield bonds), at a loss, sometime in April, 2009, and the plaintiff reasonably, but

futilely, asked for more detailed information about the loss she elected to take, and how the

reduced principal had been, or was going to be, reinvested.

     7.     Defendant SCHULTE, ANDERSON, DOWNES, ARONSON & BITTNER,

P.C., ("SCHULTE"), is a professional corporation whose principal place of business is

located in Portland, Oregon. Defendant SCHULTE employs defendant DOWNES, as a

specialist in estate planning and estate settlement matters.

     8.     Plaintiff is ignorant of the true names and capacities of defendants sued herein

as Does 1 through 20, inclusive, and therefore sue these defendants by such fictitious names.

Plaintiff will amend this complaint to allege their true names and capacities when ascertained.

Plaintiffs are informed and believe and thereon allege that each fictitiously named defendant

is responsible in some manner for the acts alleged herein.

## BACKGROUND FACTS

     9.     On November 1, 1995, Samuel J. Rupert and his wife, defendant IRENE, who

were 76 years old at the time, had estate plans prepared in Ann Arbor, Michigan, by an

experienced estate planning attorney named Alan E. Price. These plans consisted of Wills,

revocable Trusts, Durable General Power of Attorneys, Durable Medical Power of Attorneys

(with Living Will Guidelines), and Patient Advocate Acceptances. Under these plans each

person was his own trustee, initially, and the initial successor trustee for the other, until and

unless the appointment was declined, or there was a resignation, or they became incapacitated

in some way. The terms of both Trusts provided that after the death of either one of them, a

marital distribution to the other would *only* take place if it was required to avoid paying an estate tax. Otherwise, both Trusts stated that, to the maximum extent possible, all trust assets should be allocated to a Family Trust, for the benefit of both the surviving spouse and the three Rupert children (defendant WILLIAM, defendant SUSAN, and James Rupert). Under the terms for this Family Trust, the surviving spouse was the initial income beneficiary, who was to receive all the net income from the investment of the assets of the Family Trust, until the death of the surviving spouse, when the three Rupert children (defendant WILLIAM, defendant SUSAN, and James Rupert), will become the successor beneficiaries, who will become entitled to equal distributions of all remaining principal and income of the Family Trust. Also under the terms for this Family Trust, the surviving spouse and the three Rupert children, are eligible to receive discretionary payments of as much of the principal as might be needed for support for IRENE, and for education and support for the three Rupert children (defendant WILLIAM, defendant SUSAN, and James Rupert), according to support standards set forth in the terms of the trust. With regards to any discretionary payments of principal that might be made to one of the three Rupert children (defendant WILLIAM, defendant SUSAN, and James Rupert), such payments were only to be made if such payments would not jeopardize defendant IRENE'S financial security, and any such payments were to be treated as interest free advancements against each child's 1/3 share in the principal and income that remained to be distributed, after the death of the surviving spouse. Additionally, no child was to receive advancement distributions that exceeded the child's presumptive share of the trust. The terms of both Trusts also provided that after the eventual death of the surviving spouse, the remaining assets of the Family Trust (principal and income), would be distributed equally to the three Rupert children (defendant WILLIAM, defendant SUSAN, and James Rupert).

Initially, in 1995, the terms of both trusts provided that the three Rupert children (defendant WILLIAM, defendant SUSAN, and James Rupert), would be co-successor trustees, when the time came for Samuel J. Rupert and/or defendant IRENE to give up control of their own financial affairs.

10.     The terms of the trust, for both trusts, were somewhat unusual in two regards, which were: (1) openness and transparency - when control of the trust passed to the children, quarterly accounting statements had to be provided throughout the immediate family; and, (2) the lack of any type of *in terrorem*, or no contest clause, to punish any beneficiary who might challenge the division of property under the terms of the trust.  The exact provisions of defendant IRENE 'S Will , that was prepared in 1995 is currently unknown by the plaintiff, because defendant SUSAN and defendant DOWNES have this document and refuse to allow the plaintiff to have a copy of it.

11.     For roughly the past twenty (20) years, until June of 2009, the plaintiff WILLIAM has called and spoken to one or the other of his parents, on a weekly basis, usually on a Sunday night.

12.     In early 2004, Samuel J. Rupert and defendant IRENE asked the plaintiff WILLIAM if he would be willing and able to manage their estates, as the sole administrator, when they became too old to manage their own affairs, and the plaintiff WILLIAM said he would be honored, and he would be willing and able to function in this capacity as the sole administrator.

13.     On January 26, 2004, Samuel J. Rupert and defendant IRENE  had Alan E. Price modify their estate plans to designate the plaintiff, WILLIAM, as the first nominated child to succeed them, as both successor trustee and as personal representative/executor.

1    Their Trusts and their Wills were modified to nominate plaintiff WILLIAM in the first

2    position; followed by defendant SUSAN in the second position (if plaintiff was unwilling or

3    unable); and James Rupert in the third position (if defendant SUSAN was unwilling or

4    unable), to be the eventual successor trustee and personal representative/executor.  The

5    Amendment to Trust Agreements were also signed by two witnesses and notarized, on

6    January 26, 2004.  The Codicil to Wills were also signed by two witnesses, under penalty of

7    perjury, on January 26, 2004, who attested to the fact that each testator was "of sound mind,

8    and under no constraint or undue influence."

9        14.     Later in 2004, Samuel J. Rupert sent the plaintiff what he believed to be the

10   significant portions of their modified estate plans, in particular the modifications that named

11   plaintiff as the first in line to eventually manage things, when Samuel J. Rupert and defendant

12   IRENE could not.  Unfortunately, the complete estate plans were not sent along, and plaintiff

13   WILLIAM was not sent a copy of their Wills or of their Trusts or the terms of the trust at this

14   time.  Samuel J. Rupert sent along two bundles of paper clipped documents, one pertaining to

15   the Samuel J. Rupert documents, and one pertaining to the defendant IRENE  documents.

16   The first page of each bundle of documents was the Codicil to Will, followed by the

17   Amendment to Trust Agreement, followed by the Durable General Power of Attorney, the

18   Durable Medical Power of Attorney (with Living Will Guidelines), and lastly, the Patient

19   Advocate Acceptance document.  A brief note was attached to the bundle of Samuel J. Rupert

20   documents and it said,

21            "Bill,  Here are copies of our legal papers.  Except for our wills, they are

22            still being worked on.

23                            Love, Dad."

15.     At the time plaintiff WILLIAM received the documents specified in the above paragraph, both Samuel J. Rupert and defendant IRENE were in good health for their age, so the plaintiff didn't think there was any urgency with regards to the documents he received. Instead of conducting a thorough review, plaintiff WILLIAM just gave these bundles of documents a quick glance, then grabbed a file folder which he labeled as "my executor papers", and inserted the bundles of documents into the file folder and filed them away in a filing cabinet.  At the time, in part because of the note that only mentioned their "Wills", the plaintiff WILLIAM mistakenly thought that his parents estate plans only consisted of Wills (and related power of attorneys), but not revocable living trust agreements.

16.     Also in 2004, plaintiff WILLIAM made a special trip back to Ann Arbor, Michigan, for four or five days, expressly for the purposes of discussing with Samuel J. Rupert and defendant IRENE how they wanted the plaintiff to manage their estates, when the time came for them to relinquish control to him.  During this trip, plaintiff WILLIAM was shown where they kept their estate papers, so he would be able to find them when the time came, but they didn't actually get them out and go over them with plaintiff WILLIAM.  The discussions largely centered on who they wanted specific pieces of property to go to when they passed away, and where they wanted their ashes to go after they were cremated. Unfortunately, despite this meeting where many detailed matters were discussed, Samuel J. Rupert and defendant IRENE  never showed plaintiff WILLIAM  their actual estate planning documents and never told plaintiff WILLIAM that their estate planning documents included both revocable living trusts and wills. Although plaintiff WILLIAM wasn't shown the specific estate planning documents, other than the ones he would need when it was time to take over, he did have a conversation with Samuel J. Rupert, who was the more

knowledgeable of plaintiff WILLIAM'S parents, concerning the details of the estate plans, wherein plaintiff WILLIAM promised Samuel J. Rupert that he would administer their estates in complete conformity with whatever their written instructions turned out to be. Samuel J. Rupert looked plaintiff WILLIAM right in the eye and said, "That's what I'm counting on."

17.     Subsequently, Samuel J. Rupert and defendant IRENE moved into a retirement community in Milwaukie, Oregon, which is in the vicinity of Portland, Oregon, about a 20 minute drive from where the defendant SUSAN lives in Portland, Oregon.

18.     Up until May of 2009, plaintiff WILLIAM and defendant SUSAN were on good terms, although not overly close. Plaintiff WILLIAM usually traveled up to Portland, Oregon once or twice a year to visit and attend family functions, usually staying at defendant SUSAN'S residence. In August of 2006, defendant SUSAN and her family rented a beach house on the Pacific Ocean and arranged for Samuel J. Rupert and IRENE to spend the week with them at the Ocean. Plaintiff WILLIAM was also invited and drove up from California. During this family vacation, plaintiff WILLIAM mentioned to his parents, as he had at other family get-togethers in Oregon, and as he sometimes mentioned in their weekly phone conversations, that if they wanted to change the pecking order in their estate plans (to nominate defendant SUSAN in the first position), plaintiff WILLIAM would not be mad or upset (with his parents). Plaintiff WILLIAM continued to tell his parents he would be honored to be the person in charge, and he was willing and able, but if they wanted to designate defendant SUSAN in the first position (due to her geographic closeness), he would not be mad (at them). Of course, at the time these comments were made by plaintiff WILLIAM, he still had not seen his parents Wills or Trust agreements, and was not aware of the terms of their trusts. Because geographic closeness is important if one is an elderly

1   persons' health care agent, but not a significant factor for the successor trustee, plaintiff

2   WILLIAM  never would have offered to be replaced (without hard feelings), if he had known

3   about the actual terms of the trust, including the provisions relating to the Family Trust, and

4   the opportunity to be compensated as if he was a corporate fiduciary.

5          19.     Prior to the outbreak of the current disputes between plaintiff WILLIAM and

6   the defendants, in May of 2009, Plaintiff WILLIAM was never informed by either of his

7   parents that they had modified their estate plans, a second time, to designate defendant

8   SUSAN as the first nominated child to manage their estates, as successor trustee, when the

9   time came for them to give up control.   Nor was plaintiff WILLIAM ever informed by either

10  of his parents that they planned, or intended, to revise their estate plans a second time, to

11  replace plaintiff WILLIAM with defendant SUSAN, as the first nominee to manage their

12  estates when they had to relinquish control.

13

14         20.     However, in May of 2008, defendant SUSAN obtained signatures from

15  Samuel J. Rupert and defendant IRENE  on some office store power of attorney documents

16  that made defendant SUSAN their health care agent and attorney-in-fact for non trust assets.

17  Plaintiff WILLIAM was not informed of this event until he had a conversation with defendant

18  IRENE  in mid May of 2009, and she read him some portions of the document over the

19  phone. Plaintiff WILLIAM  has demanded copies of defendant SUSAN'S credentials,

20  including this document from May of 2008, but defendant SUSAN has failed and refused to

21  produce any of the alleged estate planning documents that justify her past, present, and/or

22  future administration of the Estates, or Trusts, of Samuel J. Rupert, Deceased, and/or of

23  defendant IRENE .

24

25         ///

1st Amended Complaint For Damages And Declaratory Relief
Case No. 5:09-cv-02758 JF (RS)

21.    On October 12, 2008, Samuel J. Rupert passed away, a couple days after falling out of a shower stall and hitting his head, which resulted in massive swelling on the brain. Plaintiff WILLIAM was discouraged from traveling to Portland to be at Samuel J. Rupert's bedside, while he lay dying, by defendant IRENE , because she said she would rather have the plaintiff attend the memorial service after he died, than have the plaintiff come up prior to his death. Defendant IRENE explained that the plaintiff probably couldn't afford to come up to Portland twice, and she would prefer his attendance at the memorial service. Regrettably, plaintiff WILLIAM honored the request of defendant IRENE, and he stayed in Santa Cruz County, California, instead of going to the hospital where Samuel J. Rupert was taken for hospice care, and where he ultimately died on October 12, 2008.

22.    Defendant SUSAN, in the immediate aftermath of Samuel J. Rupert's death, and the absence of the plaintiff WILLIAM, took charge of the situation, in part because defendant IRENE was too grief stricken and emotionally distraught to manage all the details that needed to be attended to. Defendant SUSAN commenced functioning and acting as the successor trustee/executor *de son tort,* for both of her parents estates and trusts, on October 12, 2008. Prior to this date, Samuel J. Rupert, had steadfastly resisted defendant SUSAN'S efforts to take over the financial affairs for, and the financial records of, Samuel J. Rupert and defendant IRENE. As a former engineer, Samuel J. Rupert was good with numbers, calculations, paperwork and financial records, and he functioned as the accountant, or bookkeeper, within his marriage to defendant IRENE (who never was particularly good with numbers or math, and lacked the aptitudes that Samuel J. Rupert possessed).

23.    Within the first week after the death of Samuel J. Rupert, plaintiff WILLIAM took it upon himself to research and review the Oregon Probate Code, to try to determine

whether the estate of Samuel J. Rupert would automatically go to defendant IRENE, as the

surviving spouse, or whether it would be necessary to commence some sort of probate

proceeding. It appeared to the plaintiff that transfer to a surviving spouse was pretty

automatic, in most situations, under Oregon statutory law, and plaintiff contacted the

defendant SUSAN to see if she knew whether his assessment of things was correct. During

this phone conversation, between defendant SUSAN in Oregon, and plaintiff WILLIAM in

California, the defendant SUSAN falsely and erroneously informed the plaintiff WILLIAM

that he was correct, and everything would automatically transfer to IRENE without any court

proceedings being required. This information that was provided by Defendant SUSAN was

false because it turns out that all of Samuel J. Rupert's estate is to go to his trust, and all of his

trust assets are to be allocated to the Family Trust, such that none of his assets should be

transferred to his surviving spouse, defendant IRENE . Defendant IRENE  is provided for

under the terms of the Family Trust, but she is not entitled to claim the Family Trust assets as

her own, or to have the assets of the Family Trust transferred to her own estate or trust.

Defendant SUSAN further informed plaintiff WILLIAM that she had taken all the remaining

estate papers and important financial records from defendant IRENE, and in her review she

had seen the 2004 modifications that were designed to put plaintiff WILLIAM  in charge of

things. However, defendant SUSAN further informed plaintiff WILLIAM that the 2004

modifications had been superseded by subsequent estate planning documents, which had been

executed by Samuel J. Rupert and defendant IRENE  more recently, which put the defendant

SUSAN in charge of things, as the administrator, instead of the plaintiff WILLIAM.

    24.    Plaintiff WILLIAM relied upon the information defendant SUSAN conveyed

to him during this phone conversation, and he reasonably assumed she knew what she was

talking about, and that she was being both competent and truthful. Plaintiff WILLIAM did not ask defendant SUSAN to show him the paperwork and other estate planning documents that purportedly put her in charge of things. Plaintiff WILLIAM blindly trusted defendant SUSAN, at this time, and he failed to verify what he had been told by defendant SUSAN.

25. Plaintiff WILLIAM traveled to Portland, Oregon to attend the memorial service which was held for Samuel J. Rupert on October 25, 2008. During this trip, plaintiff WILLIAM witnessed the fact that defendant SUSAN had assumed complete control over all aspects of the estate of Samuel J. Rupert and also over all aspects of defendant IRENE'S financial affairs. Plaintiff WILLIAM also was informed by defendant SUSAN, once again, that she had removed all financial records, and estate planning documents from defendant IRENE'S apartment. Of course, at this time, plaintiff WILLIAM  was still assuming defendant SUSAN was competent, and had told him the truth, so she was the proper person to assume control of things. By way of her wrongful conduct in October of 2008 (and subsequently), defendant SUSAN intermeddled with the estate plans of both of her parents, and improperly became the acting trustee *de son tort,* and the acting executor/personal representative *de son tort,* for both Samuel J. Rupert, Deceased, and defendant IRENE.

26. The terms of The Samuel J. Rupert Trust clearly state that the trust was created under Michigan Law and is to be governed by the provisions of Michigan Law. As such, all interested trust beneficiaries (defendant IRENE, defendant SUSAN, defendant WILLIAM, and James Rupert), were required to be informed about the existence of the trust, by any acting trustee (such as defendant SUSAN), within 28 days after such acting trustee's acceptance of the Office of Trustee. These notification requirements are found in Michigan Compiled Laws ("MCL") § 700.7303(3) of the Michigan Estates and Protected Individual's

Code ("EPIC"). Although defendant SUSAN has been the acting trustee since October 12, 2008, she has never given the statutorily required notice to all the interested trust beneficiaries of The Samuel J. Rupert Trust, which she was required to give by no later than November 10, 2008, according to Michigan law. Although defendant IRENE's purported attorney, defendant DOWNES, informed plaintiff WILLIAM, in letters dated June 10, 2009 and June 19, 2009, that defendant IRENE was now to be regarded as the acting trustee of The Samuel J. Rupert Trust (without explaining how or when defendant IRENE accepted this role that defendant SUSAN has been performing), more than 28 days have gone by since defendant DOWNES fatuous assertion that defendant IRENE is the acting trustee, and the notifications required by MCL § 700.7303(3) have not been provided to all the interested trust beneficiaries by defendant IRENE.

27.    Plaintiff WILLIAM spoke to defendant IRENE in mid November of 2008, and was concerned that his mother was being overly critical of defendant SUSAN'S performance as the administrator of things. Defendant IRENE complained, among other things, about being kept in the dark about her finances, and the fact that defendant SUSAN was acting like a dutiful daughter, but not like a daughter who enjoyed doing things with, or being around, her mother.

28.    On November 20, 2008, plaintiff WILLIAM sent a letter to defendant IRENE that included the following comments:

> "It is also possible that if you were a little more positive, and spent less
> time being judgmental and negative (about Bob and Sue), your time spent
> together, with them, might go more smoothly.
>
> I'm mentioning this last point because in our last telephone conversation I

felt like some of your criticisms of Sue were a bit on the unfair side. For
instance, it was extremely judgmental and negative for you to say Sue was
performing as a dutiful daughter, but not as if she enjoyed spending time with
you. And you judged her poorly compared to your subjective standard of
how other daughters treat their mothers. You're being judgmental and
negative to even make these comparisons, in my opinion."

29. Defendant IRENE 'S 90th birthday was in January of 2009, and plaintiff
WILLIAM traveled to Portland, Oregon, from January 10, 2009 to January 12, 2009, to attend
a surprise birthday party for her, at the home of defendant SUSAN (and her husband Bob).

30. On January 11, 2009, during discussions about the investment portfolios
defendant SUSAN was administering, defendant SUSAN informed plaintiff WILLIAM that
the investments included a high-yield bond portfolio which had been assembled by
investment advisors at Beacon Investments (in Ann Arbor, Michigan). Defendant SUSAN
further informed plaintiff WILLIAM that her good friend Kenny Dillon (who is a licensed
Investment Advisor, who complies with the notice provisions for five (5) states, which do not
include the State of Oregon), had reviewed the Beacon Investment portfolio of bond
investments, and he had given his opinion that the investments themselves seemed to be
reasonable and appropriate, but he felt Beacon Investments was charging fees that were a little
too high. Plaintiff WILLIAM was further informed that Kenny Dillon had offered to
administer these same bond investments for a smaller fee than was being charged by Beacon
Investments. Plaintiff WILLIAM asked if anyone in the family had the records of these
investments, and defendant SUSAN went into another room and returned with a five (5) or six
(6) inch thick binder, or notebook, which she plopped on the kitchen table. Plaintiff
WILLIAM simply expressed his relief that the family had the necessary financial records on
hand, but he did not examine the contents of the investment notebook.

31.     Plaintiff WILLIAM found it somewhat surprising that defendant SUSAN was planning to rely upon Kenny Dillon (of Dillon & Associates, Inc.), because Samuel J. Rupert and IRENE had been previous clients of Dillon & Associates, until Samuel J. Rupert's profound unhappiness with Kenny Dillon's performance caused him to change investment advisors, by turning to Beacon Investments. In prior years, plaintiff WILLIAM had numerous discussions with Samuel J. Rupert and IRENE  where they explained that the investments Kenny Dillon made for them failed to produce enough income for them to live on.  Samuel J. Rupert, in particular, told plaintiff WILLIAM that he had been very unhappy with the performance of Kenny Dillon, when he had been their investment advisor.  Despite the fact that Kenny Dillon was a good friend of defendant SUSAN, and an old childhood friend of defendant SUSAN'S husband Bob, Samuel J. Rupert said he felt he had no choice but to replace Kenny Dillon as their investment advisor, because his investments failed to produce enough income to live on, and that was the whole purpose of employing him as their investment advisor.  Samuel J. Rupert further told plaintiff WILLIAM that the switch to Beacon Investments had turned out much better, because the Beacon Investments portfolio produced significantly more income, even if the fees were a little higher.  Although plaintiff WILLIAM thought it was somewhat surprising that defendant SUSAN would turn to Kenny Dillon for guidance, given his miserable track record when Samuel J. Rupert and IRENE first retained him, defendant SUSAN'S assurances that he was merely going to administer the same investments for a lower fee, made it seem as if the arrangement would be okay, even if it was incredibly disloyal to the memory of Samuel J. Rupert, who never would have rehired Kenny Dillon in a million years.

32.     On January 12, 2009, plaintiff WILLIAM was scheduled to catch a late morning flight back to Santa Cruz County, California.  Around 8:30 a.m. to 9:00 a.m., while plaintiff WILLIAM was drinking a morning cup of coffee and getting ready to pack up so he

1  could catch his flight back to California, defendant SUSAN started discussing certain aspects

2  of Samuel J. Rupert and IRENE'S estate planning documents. Defendant SUSAN also

3  produced some of the estate planning documents she had in her possession, but not all of

4  them. Defendant SUSAN brought out three (3) documents for plaintiff WILLIAM to look at,

5  and mentioned that she had consulted with an attorney who told her it would be a good thing

6  for her to obtain a written statement from plaintiff WILLIAM stating that he was unwilling to

7  be the administrator of his parents estates. However, because plaintiff WILLIAM was not

8  "unwilling or unable", he declined to execute such a false statement. Instead, plaintiff

9  WILLIAM quickly inspected the three documents that defendant SUSAN brought into the

10 kitchen, which were: (1) one of the Wills, for either Samuel or Irene Rupert; (2) the power of

11 attorney document that was signed by defendant IRENE on November 13, 2008, making

12 defendant SUSAN her attorney-in-fact with broad financial powers (including the purported

13 power to modify or amend trust agreements – which is prohibited, in this case, by the relevant

14 provisions of Oregon law (ORS § 130.505); and (3) The Irene E. Rupert Revocable Trust,

15 dated November 1, 1995.

16      33.     On January 12, 2009, when plaintiff WILLIAM saw this copy of the The Irene

17 E. Rupert Revocable Trust, dated November 1, 1995, it was the first time he learned that his

18 parents estate planning documents included both wills *and* living trusts. Plaintiff WILLIAM

19 remembered he had his executor papers from 2004 back in California, but he also knew that

20 his appointment to be the personal representative/executor, in these 2004 Codicils, was

21 largely meaningless, now that he understood that Samuel J. Rupert and IRENE had both wills

22 *and* living trusts, because the successor trustee appointment is the key appointment that

23 determines the person to be in charge of things. Accordingly, plaintiff WILLIAM gave little

24 attention to the Will he was allowed to examine, other than to notice that it ultimately

25 provided for the assets of the Estate to be conveyed to the Trust, to become assets which

1  would be allocated to the Family Trust which was to be created upon the first death of either

2  Samuel J. Rupert or his wife, defendant IRENE. Plaintiff WILLIAM knew the Trust

3  Agreement was the more important document to examine.

4       34.    Accordingly, also on January 12, 2009, during this same hurried, early

5  morning discussion of important matters, plaintiff WILLIAM examined The Irene E. Rupert

6  Revocable Trust, dated November 1, 1995, and saw the successor trustee provisions stated

7  that all three (3) children (plaintiff WILLIAM, defendant SUSAN, and James Rupert) were to

8  be the co-successor trustees. Significantly, at this time, while plaintiff WILLIAM was

9  drawing erroneous conclusions about his parents estate planning documents, defendant

10  SUSAN neglected to mention or produce any of the January 26, 2004 modifications to

11  Samuel J. Rupert and IRENE'S estate planning documents (although they were in her

12  possession, custody or control). Furthermore, when defendant SUSAN made a copy of The

13  Irene E. Rupert Revocable Trust, dated November 1, 1995, and gave it to plaintiff WILLIAM,

14  she neglected to mention or include the January 26, 2004 Amendment to Trust Agreement. In

15  this Amendment, it states that plaintiff WILLIAM is the first nominated child to be the sole

16  successor trustee, then defendant SUSAN is the second nominated child and James Rupert is

17  the third nominated child.

18       35.    Based upon the incomplete and inaccurate estate planning documents

19  defendant SUSAN chose to show plaintiff WILLIAM , in her kitchen on the morning of

20  January 12, 2009, plaintiff WILLIAM mistakenly thought his parent's estate planning

21  attorney (Alan E. Price) had goofed up in 2004, by only modifying his parents' Wills, but not

22  also their Trusts. Plaintiff WILLIAM told defendant SUSAN he had executor papers from

23  2004, but the successor trustee appointment was what really counted, so the 2004

24  modifications to their Wills were largely irrelevant. Plaintiff WILLIAM  further stated to

25  defendant SUSAN that it looked to him like Alan E. Price had goofed up by only modifying

part of their estate planning documents, in 2004. Plaintiff WILLIAM shared his opinion with defendant SUSAN, that each of the three documents she brought into the kitchen and showed to plaintiff WILLIAM, indicated a different person, or persons, to be in charge of things. Defendant SUSAN neglected to correct plaintiff WILLIAM, and to inform him that the Trusts had been amended on January 26, 2004, consistent with the modifications to the Wills, to also designate plaintiff WILLIAM as the first nominated child to be sole successor trustee.

36.    Prior to the death of Samuel J. Rupert on October 12, 2008, defendant IRENE'S memory and mental capacities had been in decline for some time, as is normal for anyone who is about to turn 90 years old. After the death of Samuel J. Rupert, her decline seemed to accelerate as she coped with depression and adjustment to her new life, without her companion of 67 years. Defendant SUSAN told plaintiff RUPERT about a number of incidents that were causes for concern, due to defendant IRENE'S poor memory, and problems with numbers and simple math – like mixing up whether her teak dining room table and matching eight (8) chairs were sold by defendant SUSAN, through a "vintage" furniture dealer for $3,400.00 or for $34,000.00.

37.    Due to the commonly held belief, throughout the family, that defendant IRENE was no longer capable to manage or control her own financial affairs (after the death of Samuel J. Rupert), plaintiff WILLIAM correctly and accurately realized that defendant IRENE also lacked the testamentary capacity to execute any new estate planning documents. Therefore, plaintiff WILLIAM accepted the fact that Alan E. Price's imagined mistakes in 2004 could not be corrected by having defendant IRENE sign any new estate planning documents, in 2009, because testamentary capacity no longer existed.

38.    Accordingly, while laboring under the misconception that was created on the morning of January 12, 2009, by the incomplete and inaccurate estate planning documents defendant SUSAN chose to show plaintiff WILLIAM, and by defendant SUSAN'S failure to

1   correct plaintiff WILLIAM when he vocalized his mistaken perception of things, plaintiff

2   WILLIAM drafted an amendment to The Irene E. Rupert Revocable Trust, dated November

3   1, 1995, whereby the defendant SUSAN relied upon her November 13, 2008 Power of

4   Attorney document to amend the Trust to name herself as the sole successor trustee of The

5   Irene E. Rupert Revocable Trust.   Of course, plaintiff WILLIAM  had no idea, at this time,

6   whether the November 13, 2008 Power of Attorney document was lawful and proper, and he

7   was rushing to quickly draft the amendment for defendant SUSAN so he could finish packing

8   his clothes and then catch his late morning flight back to California.  Given the hurried

9   circumstances, plaintiff WILLIAM once again just assumed that defendant SUSAN was

10  performing in a competent, accurate, honest and lawful manner.  At this time, plaintiff

11  WILLIAM still had blind trust in defendant SUSAN.

12        39.      Later on January 12, 2009, while flying back to California, plaintiff WILLIAM

13  gave some more thought to the three (3) documents he had been shown that morning, and he

14  realized the timing of the November 13, 2008 Power of Attorney document was odd, because

15  it came weeks after defendant SUSAN had led plaintiff RUPERT to believe that Samuel J.

16  Rupert and defendant IRENE had modified their estate planning documents to put her in

17  charge of things, _prior_ to the death of Samuel J. Rupert, on October 12, 2008.  Plaintiff

18  WILLIAM  wondered why it had been necessary to execute the November 13, 2008 Power of

19  Attorney document _if_ Samuel J. Rupert and defendant IRENE'S estate planning documents

20  had really been modified prior to October 12, 2008, to put defendant SUSAN in charge of

21  things.  Plaintiff WILLIAM realized that everything he had been told by defendant SUSAN

22  was not consistent, but he chose not to make an issue of it at this time.

23        40.      In fact, although plaintiff WILLIAM was not yet aware of the truth, there was

24  no inconsistency in his parents' estate planning documents, because both the Will and Trust,

25  as amended in 2004, put plaintiff WILLIAM  in charge.  The inconsistency was between

1 | Samuel J. Rupert and defendant IRENE'S legitimate estate planning documents from 1995
2 | and 2004, and defendant SUSAN'S November 13, 2008 office store Power of Attorney
3 | document. If the plaintiff RUPERT had been fully informed of the truth, he never would have
4 | prepared defendant SUSAN 'S amendment that purports to put her in charge of defendant
5 | IRENE 'S trust, as the sole successor trustee. Had plaintiff WILLIAM known the truth, he
6 | would have told defendant SUSAN that they needed to start working together as a team of
7 | fiduciaries, because the estate planning documents put plaintiff WILLIAM in charge as the
8 | first nominated child to become the sole successor trustee and the sole personal
9 | representative/executor. However, because plaintiff WILLIAM did not know the full and
10 | complete truth at this moment, he mistakenly told defendant SUSAN he'd use her purported
11 | amendment powers from her November Power of Attorney document to draft an amendment
12 | to the 1995 terms of the trust , so she could become the sole successor trustee, instead of there
13 | being three (3) co-successor trustees. Plaintiff WILLIAM quickly drafted such an amendment
14 | and gave it to defendant SUSAN.

15 |     41.    Although defendant SUSAN'S initial request, on the morning of January 12,
16 | 2009 was that plaintiff WILLIAM draft a written statement stating his unwillingness to
17 | administer the estates of his parents (because defendant SUSAN knew, based upon advice
18 | from an attorney, that was the action which was required by the terms of the January 26, 2004
19 | Amendment To Trust Agreement for The Samuel J. Rupert Trust), plaintiff WILLIAM
20 | declined to draft such a statement because that had never been the case, and he was not
21 | unwilling to act as the administrator. Instead, based upon defendant SUSAN'S material
22 | misrepresentations of fact, through her actions and inactions on January 12, 2009, plaintiff
23 | WILLIAM drafted an amendment, on January 12, 2009, to the The Irene E. Rupert Revocable
24 | Trust, dated November 1, 1995, which he now realizes is absolutely void *ab initio*, pursuant to
25 | ORS § 130.505 (because it was based upon a power of attorney modification power that is not

1   expressly set forth and authorized in the terms of the trust).

2       42.     On January 13, 2009, after returning to California, Defendant SUSAN sent

3   plaintiff WILLIAM  and James Rupert e-mails asking for their social security numbers, as

4   beneficiaries, so she could take care of some loose ends concerning the trusts she was

5   administering as the acting trustee.

6       43.     Later on January 13, 2009, plaintiff WILLIAM responded and gave defendant

7   SUSAN his social security number, and once again set forth his misunderstanding of his

8   parents estate planning documents.  In particular, plaintiff WILLIAM stated the following

9   erroneous understanding of the situation at hand:

10              "Concerning the amendment to the trust that I composed yesterday

11              morning.  I think it would be good to inform Mother about the amendment.

12              My intention is to write her a letter informing her about the Amendment.  My

13              explanation will be that they never showed me either their Will or their Trust

14              agreements, back in 2004 when they had the Codicil prepared that  named me

15              as the first nominee to be Executor of the Will.  However, when you showed

16              me the estate planning documents, I saw that they were inconsistent,

17              regarding the Executor and Successor Trustee appointments, which is a

18              mistake."

19      42.     Plaintiff WILLIAM'S responsive e-mail, on January 13, 2009, additionally

20   stated the following:

21              "I'll tell Mother that the Trust was going to create a 3-headed monster for

22              Successor Trustee, consisting of you, me, and Jim; while the Will was going

23              to name me as the Executor; yet the recent Power of Attorney appointment

24              put you in charge.  The Amendment I drafted the other day reconciles these

25              conflicting documents by making you the Successor Trustee of Mom's

Living Trust, right now, to go with your current role as Attorney-In-Fact.
Because Mom has a Living Trust, probate will not be necessary, so the
Executor role will largely be irrelevant to what will transpire down the road,
when Mother passes over to the other side."

45.     Later yet on January 13, 2009, defendant SUSAN replied back to plaintiff
WILLIAM, with another e-mail message she sent to California, that stated, in pertinent part,
the following matters:

"Thanks Bill. I had the amendment notarized today over at Mom's bank. I
explained what it was about but I am sure that you can do a better job. **I am
also sure, however, that she will not understand or remember!**"

(bold emphasis added).

46.     In reliance upon defendant SUSAN'S conduct, and her clearly stated opinion
that defendant IRENE  was incapable of understanding, or remembering, any explanation
plaintiff WILLIAM might give her, concerning the simple trust amendment that plaintiff
WILLIAM drafted  for defendant SUSAN on January 12, 2009, plaintiff WILLIAM refrained
from sending his explanatory letter to defendant IRENE, to avoid confusing her
unnecessarily.  Plaintiff WILLIAM  also relied upon defendant SUSAN'S opinion as a further
confirmation that it was too late to consider having defendant IRENE execute any more estate
planning documents, so the imagined mistake by Alan E. Price, in 2004, could not be
corrected by having defendant IRENE execute any new estate planning documents.

47.     On January 17, 2009, defendant SUSAN sent another e-mail to plaintiff
WILLIAM, where she stated the following, in pertinent part:

"I went through the bank to get her assets into her trust.  I am now working
on getting the funds from Dad's life insurance included."

///

23
1st Amended Complaint For Damages And Declaratory Relief
Case No. 5:09-cv-02758 JF (RS)

1    48.    During February of 2009, during plaintiff WILLIAM'S weekly phone calls to

2    defendant IRENE, she again resumed the same complaints she first began in November, of

3    2008, complaining about how defendant SUSAN was treating her. Defendant IRENE again

4    repeated her complaint that defendant SUSAN was acting like a dutiful daughter, but not like

5    a daughter that enjoyed spending time with her. Plaintiff WILLIAM failed to tell defendant

6    IRENE that she was absolutely correct, because defendant SUSAN had been telling the rest of

7    the family members, behind defendant IRENE'S back, how much she really disliked

8    defendant IRENE, for years. Plaintiff WILLIAM personally can recall three (3) or (4) times,

9    within the last six (6) years, when defendant SUSAN has spoken up and volunteered the fact

10   that taking care of defendant IRENE would be a lot easier if she liked defendant IRENE, but

11   she does not like her, so taking care of her is very tiring, tedious, and difficult for her. Instead

12   of telling defendant IRENE the truth, and hurting her feelings, plaintiff WILLIAM again tried

13   to defend defendant SUSAN and get defendant IRENE to stop being so critical of defendant

14   SUSAN.

15   49.    On or about March 8, 2009, during one of plaintiff WILLIAM'S weekly phone

16   conversations with defendant IRENE, she again complained about how defendant SUSAN

17   was treating her, and keeping her in the dark with regards to her finances, and asked what she

18   could do about it. Defendant IRENE also asked how much defendant SUSAN should be paid

19   for managing things. Plaintiff WILLIAM responded by telling defendant IRENE the terms

20   of the trust entitled her to quarterly accounts, and the terms of the trust also says the successor

21   trustee should be paid like a corporate fiduciary. Plaintiff WILLIAM further told defendant

22   IRENE he'd send her a copy of the 1995 terms of the trust, that defendant SUSAN had given

23   him on January 12, 2009. Also in this conversation, plaintiff WILLIAM was informed by

24   defendant IRENE that her long term care insurance company wanted her to be re-examined

25   to see if she really qualified for long term care and needed to live in the assisted living section

1   at Willamette View, or whether she was capable of living in the independent living section of

2   the retirement community at Willamette View. This added a new financial worry, as

3   defendant IRENE worried about the expense of living in the assisted living section, if the

4   long term care insurance benefits were cut off.

5       50.    On March 9, 2009, as promised, plaintiff WILLIAM sent defendant IRENE a

6   copy of the 1995 version of the terms of her trust, along with a letter that included the

7   following comments, in pertinent part:

8               "The most important item among the enclosures is a copy of the terms of

9               the trust for your Trust that Sue is administering as the Successor Trustee. As

10              I told you earlier on the phone, there is a Section 11, on page 6, which

11              includes a Condition 2 that requires Sue to give you an "accounting" of the

12              status of the trust on a quarterly basis; and a Condition 3 that spells out how

13              reasonable compensation for Sue should be determined."

14      51.    Subsequently, in late March or early April of 2009, defendant IRENE was re-

15  examined for insurance purposes and her doctor diagnosed her as suffering from the effects of

16  Alzheimer's disease, according to what plaintiff WILLIAM was told by both defendant

17  SUSAN and defendant IRENE, in separate phone conversations with each of them. Needless

18  to say, defendant IRENE seemed further depressed by this medical assessment that

19  confirmed her lack of mental capacity and ability to manage her own financial affairs.

20      52.    Around mid-April of 2009, defendant IRENE complained to plaintiff

21  WILLIAM that when she tried to call defendant SUSAN, her husband, Bob Bond, would

22  answer the phone and grill her about why she was calling defendant SUSAN. Defendant

23  IRENE said Bob told her she was calling defendant SUSAN too much, and he sometimes

24  refused to put defendant SUSAN on the phone. According to defendant IRENE, Bob told her

25  to contact the staff at Willamette View, instead of calling defendant SUSAN to ask questions.

53.     On April 23, 2009, during another phone conversation between plaintiff WILLIAM and defendant IRENE, she continued to complain that defendant SUSAN was treating her like an imbecile, and she complained about her lack of knowledge concerning her finances which defendant SUSAN was controlling, but not revealing. Plaintiff WILLIAM told his mother, defendant IRENE, during this conversation, that he would talk to defendant SUSAN and remind her of her duty to provide quarterly accountings.

54.     On April 26, 2009, plaintiff WILLIAM spoke to defendant IRENE , on the phone once again, and she told plaintiff WILLIAM that defendant SUSAN had basically disowned her. Plaintiff WILLIAM again told defendant IRENE she was being unfair to defendant SUSAN, and she needed to stop being so negative and judgmental. However, plaintiff WILLIAM again stated that he'd talk to defendant SUSAN, and remind her about her obligation to provide quarterly accountings to defendant IRENE and all other income beneficiaries. Significantly, under Michigan law, the term "income beneficiary" means persons to whom net income is or may be payable (see MCL § 555.502, section 102(e)), so in this case, the income beneficiaries of the Samuel J. Rupert Trust, who were entitled to quarterly accounts from the acting trustee *de son tort,* defendant SUSAN , were defendant IRENE , defendant WILLIAM, and James Rupert.

55.     On April 30, 2009, defendant SUSAN called plaintiff WILLIAM and a discussion took place concerning defendant IRENE'S desire to know what was going on with regards to her finances and the assets of the trusts that defendant SUSAN was administering as if they had been consolidated into a single trust. Plaintiff WILLIAM suggested that defendant SUSAN provide a full accounting that would be essentially an income statement and a balance sheet. Defendant SUSAN responded by saying defendant IRENE wouldn't be able to understand such an accounting and said she'd provide the information that she thought defendant IRENE was most concerned about. Defendant SUSAN also happened to

1  mention that she had caused the Beacon Investments High Yield Bond portfolio to be sold off,

2  at a loss, but she thought taking a loss was okay because she didn't think those investments

3  were very likely to come back and regain their value any time soon.  Defendant SUSAN

4  further informed plaintiff WILLIAM  that her plan was to have Kenny Dillon reinvest the

5  reduced principal amount in some other type of investments, which were not specified.  After

6  hearing this surprising information (which contradicted what the plaintiff WILLIAM had been

7  told on January 11, 2009, concerning Kenny Dillon's planned role).  Plaintiff WILLIAM

8  mentioned that a full accounting should definitely be provided, because she'd made such

9  drastic changes in the assets of the trusts she was administering.  Defendant SUSAN again

10  balked at providing a real and legitimate accounting to defendant IRENE , and again said

11  defendant IRENE  couldn't understand these things.  Plaintiff WILLIAM  ended the

12  conversation by telling defendant SUSAN  he'd leave it up to her discretion as to what sort of

13  accounting she provided to defendant IRENE .  This comment by plaintiff WILLIAM was not

14  intended to convey the message that whatever type of accounting was provided to defendant

15  IRENE  would necessarily be approved by plaintiff WILLIAM, if it turned out to be

16  inadequate.  Plaintiff WILLIAM simply meant to convey the message that he wasn't going to

17  make a big issue out of the form of the accounting, in advance, and if the content of the

18  accounting was sufficient to allow someone to evaluate things and understand how the

19  administration of things was progressing, that would be satisfactory with plaintiff WILLIAM.

20  Obviously, plaintiff WILLIAM reserved the right to object to an inadequate or insufficient

21  accounting, if that was all that defendant SUSAN prepared and presented to defendant

22  IRENE.

23         56.     On May 4, 2009, plaintiff WILLIAM spoke to defendant IRENE  on the phone

24  once again, and he let her know how surprised he had been to hear that the Beacon

25  Investments High Yield Bond portfolio had been disposed of, at a loss, because that was not

1   the plan that defendant SUSAN had explained to him on January 11, 2009, just before

2   plaintiff WILLIAM drafted the amendment that put her in charge. Defendant IRENE

3   informed plaintiff WILLIAM that defendant SUSAN had promised to give her a financial

4   report on Wednesday, May 6, 2009. Plaintiff WILLIAM informed defendant IRENE that

5   he'd wait until after defendant SUSAN provided her accounting, or financial report, before he

6   did anything to express his reasonable concerns about her investment decisions, or her duty to

7   also provide a quarterly accountings to plaintiff WILLIAM and to James Rupert, because

8   they were also regarded as "income beneficiaries" under Michigan law. The information

9   concerning defendant SUSAN'S duty to also provide quarterly accountings to both plaintiff

10   WILLIAM and to James Rupert, was discovered after plaintiff WILLIAM did some legal

11   research into the term "income beneficiaries", under both Michigan and Oregon law, and he

12   discovered that the term included both actual income beneficiaries and also people who could

13   be, or might become, income beneficiaries in the future, such as plaintiff WILLIAM and

14   James Rupert, under the provisions of the terms of the trust describing how the Family Trust

15   is to be created and administered.

16        57.     On May 7, 2009, plaintiff WILLIAM spoke to defendant IRENE on the

17   phone, and she informed plaintiff WILLIAM about the information that defendant SUSAN

18   provided to her. Plaintiff WILLIAM told defendant IRENE the information was inadequate

19   because it failed to explain a number of things that should have been clearly set forth. For

20   instance, it didn't explain if things had gotten better or worse under defendant SUSAN'S

21   administration, it didn't shed any light on the disposal of the Beacon Investments High Yield

22   Bond portfolio, and it didn't shed any light on how much defendant SUSAN had taken as

23   fees, or gifts, out of the Trust assets, during her administration. Plaintiff WILLIAM informed

24   defendant IRENE he would send a letter to defendant SUSAN expressing his concerns that

25   the disposal of the Beacon Investments High Yield Bond Portfolio may have been a mistake,

1 and he'd also ask for more information about this specific transaction. At this time, Plaintiff

2 WILLIAM still had faith and confidence in defendant SUSAN, and he told defendant IRENE

3 he was sure that defendant SUSAN would eventually give him the information he was going

4 to ask for, because if she didn't she would be in breach of the terms of the trust, and could be

5 removed as successor trustee, for cause.

6       58.    On May 8, 2009, plaintiff WILLIAM drafted a polite, but rather detailed, 13

7 page letter to defendant SUSAN, wherein he suggested her view of high yield bonds (which

8 are sometimes called junk bonds by some people), may have been overly simplistic and

9 inaccurate, and he also included 10 pages of attachments, Attachments #1-6, which were

10 internet articles concerning high-yield (or junk) bonds. In this letter, plaintiff WILLIAM

11 referred to the Irene E. Rupert Revocable Trust, Dated November, 1995, because plaintiff

12 WILLIAM was *still* not aware of the 2004 amendments to the trusts of Samuel J. Rupert and

13 defendant IRENE. This letter also informed defendant SUSAN that the amendment she

14 tricked plaintiff WILLIAM into drafting was absolutely void, or void *ab initio,* under both

15 Michigan and Oregon law. Plaintiff RUPERT even referred to the Oregon statute (ORS §

16 130.505), that makes it clear the terms of a trust trump any inconsistent, or broader powers,

17 that may appear in a subsequent power of attorney document. Plaintiff WILLIAM also asked

18 for additional information concerning the disposal of the Beacon Investments High Yield

19 Bond Portfolio. Additionally, plaintiff WILLIAM asked defendant SUSAN to not make any

20 more unilateral changes to the trust assets, and further informed defendant SUSAN that he

21 was ready and willing to function as one of the co-trustees of the Trust. On page 12 of this

22 letter, plaintiff WILLIAM stated the following:

23             "You're really going to have to prepare, or cause to be prepared, an

24             accounting that shows the assets you took control over, the changes in the

25             assets you caused to be made, and the receipts and disbursements which have

1

been made, since you assumed control."

2     59.    In this letter dated May 8, 2009, plaintiff WILLIAM also offered to prepare

3     the accounting himself, if defendant SUSAN would send him the underlying documents. On

4     page 13 of this letter, plaintiff WILLIAM makes the following comments:

5               "Consultation and consensus needs to be how we proceed into the future.

6               We all want the same thing, so we should all be able to cooperate in

7               formulating, and executing, a plan that will achieve our common objectives."

8     60.    On May 9, 2009, plaintiff WILLIAM mailed his May 8, 2009 letter to

9     defendant SUSAN, along with directions to two Safeway Stores that are within 3 miles of

10    defendant IRENE'S apartment, and a short note suggesting that the next time defendant

11    IRENE asked to go to a Safeway, defendant SUSAN actually take her to the store. This

12    related to an earlier incident defendant SUSAN had told plaintiff WILLIAM about, where

13    defendant IRENE had asked to be taken to a local Safeway store, but defendant SUSAN said

14    she didn't know how to get there. In response to defendant SUSAN'S comments, defendant

15    IRENE said she thought she knew how to get there, so defendant SUSAN let defendant

16    IRENE be the navigator and give the driving instructions, until they got lost on a dead end

17    street in a warehouse district. Plaintiff WILLIAM'S short note, that accompanied his lengthy

18    May 8, 2009 letter, suggested it might be nice to actually take defendant IRENE to one of the

19    nearby Safeway stores, instead of testing defendant IRENE, and making her feel stupid due to

20    her diminished mental capacity, which is to be expected after a diagnosis that a 90 year old

21    person has Alzheimer's Disease.

22    61.    On May 11, 2009, plaintiff WILLIAM spoke to defendant IRENE on the

23    phone on a Monday evening, and she informed him that defendant SUSAN had received his

24    letter and was quite upset about it. Plaintiff WILLIAM informed defendant IRENE that all

25    he was attempting to do was get the information defendant SUSAN had a duty to share with

1  her, with plaintiff WILLIAM and with James Rupert (as income beneficiaries), so she

2  shouldn't be upset.

3        62.     On May 12, 2009, plaintiff WILLIAM got up early in the morning and went to

4  his home office, and just for the heck of it, he opened his file cabinet and got out the file

5  folder he marked as "My Executor Papers", back in early 2004, and decided to take another

6  look at the Codicil papers he'd received back in 2004. Plaintiff WILLIAM removed the paper

7  clips holding the bundles of papers together, and he could hardly believe his eyes when he

8  saw the page twos of the five page bundles, because each of these page twos was a notarized

9  Amendment to Trust Agreement, one signed by defendant IRENE, and one signed by Samuel

10  J. Rupert, and both were also signed by two witnesses, on January 26, 2004. Both of these

11  Amendments to Trust Agreement nominated plaintiff WILLIAM, before either defendant

12  SUSAN or James Rupert, to be the sole successor trustee. This moment was the first time

13  plaintiff WILLIAM realized his parents' estate attorney, Alan E. Price, had _not_ made a

14  mistake when he prepared the Codicils to their Wills, and there was no inconsistency between

15  their Wills and their Trusts. Both of their estate planning documents, as amended in 2004,

16  were in perfect harmony, and they both named plaintiff WILLIAM as the first nominated

17  child to be in charge. The more plaintiff WILLIAM thought about defendant SUSAN'S

18  silence, on January 12th and 13th, of 2009, when plaintiff WILLIAM kept repeating his

19  mistaken view that the Wills and Trusts were inconsistent, the more he realized how badly he

20  had been taken advantage of, by defendant SUSAN's silent fraud . Plaintiff WILLIAM

21  quickly dashed off a letter, dated May 12, 2009, wherein he now referred to the Irene E.

22  Rupert Revocable Trust, _As Amended January 26, 2004_. Plaintiff WILLIAM also wondered

23  about defendant SUSAN'S story in October of 2008, when she verbally told plaintiff

24  WILLIAM that Samuel J. Rupert and defendant IRENE had changed their estate planning

25  documents to put her in charge, instead of plaintiff WILLIAM . Plaintiff WILLIAM attached

1   the 2004 Amendment to Trust Agreement and the 2004 Codicil to Will of Irene E. Rupert to

2   his May 12, 2009 letter.  Plaintiff WILLIAM'S letter further stated that he was willing and

3   able to act as the successor trustee, and that he accepted the appointment as the successor

4   trustee.  The gist of plaintiff WILLIAM 'S letter was summed up on page 5, where it states:

5          "If the attached codicil and amendment, from January 26, 2004, were ever

6          changed by Mom and Dad, as you led me to believe in late October of 2008,

7          then it is time to produce the written changes and show me the documents

8          that give you authority to manage Mother's Trust."

9   63.    On May 12, 2009, plaintiff WILLIAM  talked to defendant IRENE on the

10  phone during the evening, and told her about his mindboggling discovery of the 2004

11  Amendments to the Trust Agreements, and  how this discovery shed a new light on the entire

12  situation.  Plaintiff WILLIAM further told defendant IRENE that, technically (if only the

13  terms of the trust were considered, without regards to the statutory law of Michigan or

14  Oregon), she was still the trustee of her own living trust, because defendant SUSAN 'S

15  January 12, 2009 trust amendment was void *ab initio*, and her power of attorney document

16  from November 13, 2008 was also ineffective to amend or modify the terms of the trust.

17  Defendant IRENE  confirmed the fact, during this conversation, that she didn't think she

18  should act as the trustee of any of the Trusts, because of her memory problems and

19  difficulties.

20  64.    Later that evening, defendant IRENE called back and spoke to plaintiff

21  WILLIAM again.  She stated she had found another power of attorney document from May of

22  2008, and she read portions of the document to plaintiff WILLIAM, over the phone.  Plaintiff

23  WILLIAM stated that he'd really need to see and study the document before he could give a

24  fully informed opinion about it, but the portions she read didn't convince plaintiff WILLIAM

25  it was enforceable, because there were major portions that sounded like they conflicted with

1   the terms of the trust (which prevails in any conflict with a subsequent power of attorney).

2       65.    On May 13, 2009, plaintiff WILLIAM wrote and sent a letter to defendant

3   IRENE , which included an enclosed document entitled "Statement Of Resignation of Initial

4   Trustee", which plaintiff WILLIAM suggested she sign and send to plaintiff WILLIAM , to

5   defendant SUSAN, and to James Rupert. Plaintiff WILLIAM also sent copies of this letter to

6   defendant SUSAN and James Rupert, and stated that he didn't think defendant SUSAN would

7   object to her formal resignation, because that is what the terms of the trust required. Plaintiff

8   WILLIAM'S letter pointed out that the only two other ways for her removal as her own

9   trustee would be by her death, or by her being determined "financially incapable" of handling

10  her own affairs, by her doctor, after an examination for that purpose. Plaintiff WILLIAM'S

11  letter further explained that he wanted to spare defendant IRENE the humiliation and

12  indignity of such an examination, so her signing the written resignation statement was the

13  best, and kindest, way to go (given the fact that defendant IRENE  had told plaintiff

14  WILLIAM she didn't think it was a good idea for her to try to perform as trustee).

15      66.    On May 15, 2009, plaintiff WILLIAM sent a letter to defendant SUSAN that

16  addressed two main issues. The first issue he addressed was the power of attorney document

17  from May of 2008, that defendant IRENE only told plaintiff WILLIAM about after he had

18  already mailed his May 12, 2009 letter to defendant SUSAN. Plaintiff WILLIAM asked for a

19  copy of the May, 2008 power of attorney document. The second issue was plaintiff

20  WILLIAM'S polite explanation for bombarding defendant SUSAN with written letters,

21  instead of just picking up the phone and calling her. Plaintiff WILLIAM'S letter explained it

22  was an approach he always used when he deemed an issue important, and he cared about the

23  issue. Plaintiff WILLIAM further explained this approach was taught to him by a former

24  instructor in the Business Law courses he took at the University of Michigan, who stressed

25  the difficulty in proving what was said in unrecorded verbal conversations. This instructor

stressed the advantages of dealing with important issues in such a way that a tangible, durable record was created. On page 5 of this letter, plaintiff WILLIAM summed up his approach by saying:

> "My working assumption is that if I give you adequate time to ponder and research the issues I have presented (including your consultation with an attorney, if you feel it necessary), you will eventually come around and realize both the law and the facts are on my side, and you have to give me the additional information I have requested."

67.    Plaintiff WILLIAM'S letter additionally mentioned that he lacked a copy of Irene E. Rupert's Will, and he also lacked copies of defendant SUSAN'S two power of attorney documents, from May and November of 2008. Defendant SUSAN was asked to provide plaintiff WILLIAM with copies of these documents, but she has failed and refused to do so.

68.    On May 16, 2009, plaintiff WILLIAM received a letter from defendant SUSAN, at his residence in Ben Lomond, Santa Cruz County, State of California, which was purportedly written in her capacity as successor trustee, dated May 12, 2009, which states, in its entirety:

> "Dear Bill and Jim,
>
> Enclosed please find a quarterly account of Mom's trust receipts and disbursements and the trust assets as of March 31, 2009.
>
> > Sincerely,
> > Susan Bond,
> > Successor Trustee."

69.    Unfortunately, the attached "quarterly account" turned out to be a bad faith, gibberish account that is unintelligible and worthless. Defendant SUSAN'S so-called account merely lists eights (8) amounts of money, with generalized descriptions such as Irene E.

1   Rupert Trust, and Samuel-Irene Rupert Trust, and then she adds these amounts up to get a

2   total of $874,995.00, which she declares to be the assets of the IRENE E. RUPERT TRUST,

3   as of March 31, 2009.

4       70.     On May 17, 2009, plaintiff WILLIAM wrote and sent another letter to

5   defendant SUSAN, wherein he objected to, and rejected, her bad faith, gibberish accounting

6   and pointed out a number of the problems with her approach, by contrasting it with the

7   information the courts of Oregon require for an accounting filed by a fiduciary. Plaintiff

8   WILLIAM further enclosed a copy of Oregon UTCR Form 9.160, so she could see with her

9   own eyes what is required in a legitimate accounting statement. Plaintiff WILLIAM also

10  informed defendant SUSAN that she had one strike on her, and she only was going to get

11  three strikes before plaintiff WILLIAM would turn to the courts and seek an order forcing

12  defendant SUSAN to file a legitimate accounting. Additionally, plaintiff WILLIAM again

13  demanded that defendant SUSAN produce her credentials, and any and all documents that

14  supported her claim that she was the lawful and legitimate successor trustee of The Irene E.

15  Rupert Trust, as Amended. As an aid to her understanding the rules that needed to be

16  complied with, plaintiff WILLIAM tried to explain that she was not entitled to make up, or

17  invent, her own rules and procedures concerning the contents of a required accounting.

18  Instead, plaintiff WILLIAM told defendant SUSAN that the rules to be followed were a

19  blending of the terms of the trust and of Chapter 130 – Uniform Trust Code, of the Oregon

20  Revised Statutes, 2007 Edition. To assist defendant SUSAN, plaintiff WILLIAM even

21  enclosed a copy of the entire 41 page Chapter 130.

22      71.     On May 18, 2009, plaintiff WILLIAM mailed his May 17, 2009 letter to

23  defendant SUSAN, and all other members of the immediate family.

24      72.     On May 19, 2009, plaintiff WILLIAM called defendant IRENE around 4:15

25  p.m., and when he told her it was him calling, and asked how she was doing, she responded

1 with a coldness, and apprehensiveness in her voice as she said she was ok, but then she

2 quickly said she couldn't talk at that time. She further told plaintiff WILLIAM she'd call him

3 right back, in a little while. However, she never called back.

4      73.    On May 20, 2009, plaintiff WILLIAM'S May 17, 2009 letter was delivered to

5 defendant SUSAN'S residence address in Portland, Oregon, at 10:46 a.m., according to the

6 delivery confirmation records of the United States Post Office.

7      74.    Also on May 20, 2009, defendant SUSAN called plaintiff WILLIAM at his

8 home in California, around 3:30 p.m. and told him she was in receipt of all his letters and she

9 had read them. Defendant SUSAN then further advised plaintiff WILLIAM that both she and

10 defendant IRENE had retained an attorney, who was reviewing his letters, and who would

11 contact plaintiff WILLIAM with a response when he was done with his review. Then

12 defendant SUSAN informed plaintiff WILLIAM that the entire High Yield Bond Portfolio

13 had not been sold off, only a portion, so plaintiff WILLIAM didn't have to worry about that

14 issue. Next, defendant SUSAN told plaintiff WILLIAM she was very disappointed in him,

15 but she didn't want to talk to plaintiff WILLIAM on the phone, because she didn't trust him.

16 Plaintiff WILLIAM scoffed at her suggestion that he was the person who couldn't be trusted,

17 and he told her that was like the pot calling the kettle black. Defendant SUSAN again said

18 she didn't want to talk to plaintiff WILLIAM, and she was only calling to tell plaintiff

19 WILLIAM that defendant SUSAN and defendant IRENE had jointly retained an attorney,

20 who plaintiff WILLIAM would be hearing from, then defendant SUSAN hung up the phone

21 without saying another word.

22      75.    Later on May 20, 2009, plaintiff WILLIAM called defendant IRENE on the

23 phone, around 4:15 p.m., and asked her if defendant SUSAN had caused her to be afraid to

24 talk to him. Plaintiff WILLIAM told defendant IRENE about his brief conversation with

25 defendant SUSAN, and added that he was not upset with defendant IRENE , and she had

1   nothing to be afraid about, concerning plaintiff WILLIAM, because he was only trying to

2   correct defendant SUSAN'S mistakes and to make things better for her.  Defendant IRENE

3   responded curtly and coldly by saying that it was again a bad time for her , and then she also

4   hung up on plaintiff WILLIAM without saying another word.

5       76.    Subsequently, plaintiff WILLIAM sent additional informative and educational

6   letters, with enclosures, to defendant SUSAN, dated May 21, 2009, May 23, 2009, May 25,

7   2009 and May 30, 2009, which were all ignored by defendant SUSAN .  The May 21, 2009

8   letter was noteworthy because it included the following comments, which show plaintiff

9   WILLIAM'S continuing reliance upon defendant SUSAN'S repeated verbal statements, and

10   her written admission, in her January 13, 2009 e-mail to plaintiff WILLIAM , that defendant

11   IRENE  was incapable of understanding or remembering even a simple amendment to the

12   terms of her trust :

13       "You haven't given me any of the information I have requested, but this

14       issue concerns you and me, not Mom.  You haven't produced any documents

15       to substantiate the representations you made last October, to the effect that

16       Mom and Dad's estate planning documents were updated, subsequent to

17       January 26, 2004, to name you, instead of me, as the sole successor trustee.

18       Once again, this issue concerns you and me, not Mom.

19       Given Mom's Alzheimer's diagnosis, her faulty memory makes her

20       incompetent to be a witness, or to ratify any of your actions since you seized

21       control of Mom's Trust.

22       Nor is Mom competent to amend or modify any of the estate planning

23       documents that do exist.  It's too late to pressure Mom into executing any

24       new documents that will be relevant to our current disputes over your

25       secretive, high handed administration of Mom's Trust.

1   **The proper resolution of my challenge to your credentials to be**

2   **successor trustee will be based upon the written estate planning**

3   **documents that already exist.** I've put my cards on the table, and I've

4   challenged you to do the same, so we can determine who is entitled to be the

5   successor trustee, with over-all control of the administration of Mom's Trust.

6   Even if you're not entitled to be the sole successor trustee, my recent

7   letters to you have included repeated suggestions that we work together, as a

8   team, to administer Mom's Trust.  What is so outrageous about my

9   suggestion that we work together as a team, to do all the things that need to

10   be done, to fully comply with the terms of the trusts that Mom and Dad

11   created in 1995, and amended in 2004?"

12   (bold emphasis added).

13   77.   Additionally, plaintiff RUPERT send another letter to defendant IRENE, dated

14   May 27, 2009, which again repeated the theme that he and defendant SUSAN should work

15   together, as a team of fiduciaries, because the totality of her estate planning documents, as far

16   as plaintiff WILLIAM could tell from what he had heard about the documents he had yet to

17   see, showed that a team of fiduciaries had been appointed to administer her medical and

18   financial affairs.  Plaintiff WILLIAM has never disputed defendant SUSAN'S position as

19   defendant IRENE'S health care agent and attorney-in-fact for defendant IRENE'S non-trust

20   assets (which should be minimal, if her Trust is being properly administered).

21   78.   On June 5, 2009, plaintiff WILLIAM received a short letter from defendant

22   IRENE, dated June 2, 2009, wherein she stated the following point of view:

23   "Dear Bill,

24   I have tried and tried to reach you by telephone and just get the busy

25   signal.  What I wanted to say is to stop all these letters etc. or else I will

38

1st Amended Complaint For Damages And Declaratory Relief
Case No. 5:09-cv-02758 JF (RS)

take you out of my will.  This just cannot go on and has done nothing but cause sleepless nights and headaches and loss of money – for me and Susie as well.

> Your Mother
>
> I hate doing this but this has to stop.
>
> Jim agrees and your Dad would, too.
>
> In fact you have antagonized the whole family."

79.    On June 7, 2009, plaintiff WILLIAM drafted a letter to defendant IRENE, in response to her June 2, 2009 letter, which was mailed to her on June 8, 2009.  Plaintiff WILLIAM'S significant comments in this letter included the following comments, in pertinent part:

> "From my point of view, my dispute with Susie boils down to a simple choice between right and wrong.  Following the rules and doing things correctly in a lawful manner is the right thing to do, and that is what I am advocating.  Disregarding the rules (i.e., the Terms of your Trust), and doing things incorrectly, contrary to state law, is the wrong thing to do, and that is what Susie has been doing since last October.
>
> If Susie's actions are defensible, why has she been stonewalling me instead of explaining and defending her actions?  How could she act any more guilty of wrongdoing than she has over the last month?
>
> In any event, I'm not going to break my promise to Dad, which is what you are asking me to do, with your threats to disinherit me unless I stop insisting that we follow the rules and do things correctly, according to the law.
>
> If you want to act out in a confused, counterproductive, and vindictive

manner, by writing me out of your will, that is your choice. But I hope you haven't been led to believe that such a confused, ridiculous, unjustified action, to punish me for doing what is right and honorable, would settle or resolve anything.

**If you were to take me out of your will, it would only GUARANTEE a lengthy court battle where some of the issues to be litigated would be: (1) your testamentary capacity to make such a change;  (2) whether the change was the result of undue influence upon you, by Susie; and (3) whether you were psychologically vulnerable and confused at the time the change was made.**

If you want to guarantee that your Trust assets will be wasted on unnecessary legal fees for lawyers, then taking me out of your Will, to punish me for trying to help you and keep my pledge to Dad, is the best way to go.

On the other hand, if you want to be reasonable, you should put some pressure on Susie to answer my questions, explain her actions, and show me your estate planning documents she is keeping secret."

(bold emphasis added)

80.    On June 13, 2009, plaintiff WILLIAM received a letter in the mail at his residence in Santa Cruz County, California, dated June 10, 2009, from defendant GILE R. DOWNES ("DOWNES"), on stationary showing he is associated/employed by the firm of SCHULTE, ANDERSON, DOWNES, ARONSON & BITTNER, P.C. ("SCHULTE"), who is another defendant in this case. In this surprising letter, defendant DOWNES boldly and brashly informed plaintiff RUPERT, that: (1) his prospective inheritance rights had been substantially reduced, and he had been replaced as successor trustee of all trusts (the monetary reduction was by at least the amount of defendant DOWNES'S legal fees, and expenses, for

1   drastically changing the estate plans of defendant IRENE, his purported new client, to keep

2   defendant SUSAN in power as the successor trustee, and to allow her to suppress and conceal

3   the results of her illegitimate administration of the trusts of Samuel J. Rupert and defendant

4   IRENE, as the acting trustee *de son tort,* subsequent to the death of Samuel J. Rupert on

5   October 12, 2009); (2) his prospective inheritance rights could and would be further reduced

6   if he persisted in writing letters and seeking information about the assets and administration of

7   the trusts of Samuel J. Rupert and defendant IRENE ; and (3) his prospective inheritance

8   rights would most likely be completely eliminated unless plaintiff WILLIAM signed an

9   enclosed Modification Of Trust agreement (ORS § 130.200(2)), concerning the Samuel J.

10  Rupert Trust[1], and returned it to defendant DOWNES in the enclosed stamped, self-addressed

11  envelope, by June 19, 2009.

12      **81.**    This letter from defendants DOWNES & SCHULTE also stated that, "Your

13  mother's trust will have substantially all the family assets in it, except for less than $100,000,

14  which is in your father's trust." However, Samuel J. Rupert intended all his assets to be

15  allocated to The Samuel J. Rupert Family Trust, and the terms of his trust do not provide for

16  the wholesale transfer of his estate or trust assets to defendant IRENE'S trust or estate.

17

18  ───────────────

[1]  Whereby defendant SUSAN was named the new successor trustee (retroactive to June 9,

19  2009), and relieved of the responsibility to pay the net income to defendant IRENE , and

20  relieved of the duty to comply with the standard of support Samuel J. Rupert set forth in the

21  terms of his trust (for his wife and children), while plaintiff WILLIAM  went from being the

22  first nominated child to be the successor trustee (after defendant IRENE), to a person who

    would never, ever, under any circumstances, have the opportunity to be the successor trustee

23  of the Samuel J. Rupert Trust.  Defendant SUSAN'S children (Christopher and Patrick) were

24  even mentioned as potential successor trustees, in the proposed consent modification

25  agreement, but the language concerning plaintiff RUPERT was the following:

                    "Under no circumstances shall William Rupert be trustee".

82. The June 10, 2009 letter from defendant DOWNES, was essentially a confession that he had, and was, conspiring with defendant SUSAN, to take advantage of defendant IRENE , through use of improper means (utilizing defendant SUSAN'S confidential relationship, dominance, and undue influence, and taking advantage of defendant IRENE'S Alzheimer's Disease), for the improper purposes of: (1) removing plaintiff WILLIAM as the first nominated successor trustee, without cause or justification; (2) for the improper purpose of allowing defendant SUSAN to suppress and conceal the results of her illegitimate administration as the acting trustee/executor *de son tort,* for both her parents trusts; (3) for the improper purpose of drastically changing defendant IRENE'S estate plans to add draconian in terrorem, or no contest clauses, that can be triggered by any criticism of the administration of the trust by defendant SUSAN, regardless of the wrongdoing, or misconduct, that can be shown; (4) for the improper purpose of rewarding defendant SUSAN for her misconduct and fraudulent behavior, and insulating her performance from any meaningful review by any of the other interested trust beneficiaries (and/or qualified beneficiaries); (5) for the improper purpose of looting and plundering the assets that were supposed to be allocated to The Samuel J. Rupert Family Trust; and, (6) for the improper purpose of punishing plaintiff WILLIAM financially, without justification or any reasonable basis for the punishment, by interfering with his economic relations and prospective inheritance, as set forth in the legitimate estate planning documents of Samuel J. Rupert and defendant IRENE, from 1995 and 2004 (who prior to the intentional interference by defendants SUSAN, DOWNES and SCHULTE, had a prospective inheritance share of $291,665.00, plus the compensation he could have received for functioning as the successor trustee, of both of his parents trusts, which would entitle him to be compensated as if he was a corporate fiduciary who was administering $874,995.00 in trust assets).

///

83.     On June 11, 2009, plaintiff WILLIAM drafted and mailed a letter to Alan E. Price, the estate attorney from Ann Arbor, Michigan who prepared Samuel J. Rupert and defendant IRENE'S 1995 estate planning documents, and modified them on January 26, 2004, seeking any relevant information Mr. Price may have, as well as seeking copies of the important estate planning documents that defendant SUSAN has been suppressing and concealing from plaintiff WILLIAM. In this letter, plaintiff WILLIAM mentioned that defendant IRENE had Alzheimer's Disease, and thereafter inquired about the unusually transparent accounting provisions contained in the terms of the trust, and about the lack of any no contest clauses, and plaintiff WILLIAM asked Mr. Price if those provisions were intentional, deliberate estate planning decisions of Samuel J. Rupert and defendant IRENE. Plaintiff WILLIAM sent copies of his letter to Alan E. Price to defendant SUSAN, to defendant IRENE, and to James Rupert (but not to defendant DOWNES).

84.     Plaintiff WILLIAM drafted a letter, dated June 16, 2009, addressed to defendant DOWNES, which was mailed on June 18, 2009, wherein he informed defendant DOWNES that defendant IRENE lacked the mental capacity to enter into any contracts with him, or to drastically change her estate planning documents, so he should revoke, rescind or otherwise cancel all documents that had been signed by defendant IRENE. Plaintiff WILLIAM further informed defendant DOWNES that he was the successor trustee and he was instructing him to refund all amounts of money he had received from defendant IRENE, or out of any accounts that were assets of her Trust. Plaintiff WILLIAM additionally informed defendant DOWNES that unless he took appropriate corrective action, now that he had been informed about defendant IRENE'S undisputed lack of testamentary capacity to execute new estate planning documents, he would be facing potential civil liability for the tort of intentional interference with economic relations, for all the monetary damages that plaintiff WILLIAM suffered, due to defendant DOWNES'S conspiratorial actions with defendant

1 | SUSAN.

2 | 85. Also on June 16, 2009, defendant DOWNES drafted and sent two (2) letters,

3 | by e-mail and regular mail, relative to this controversy. The first was a letter to Alan E. Price,

4 | where he spoke for defendant IRENE, who he stated he was representing in her capacity as

5 | trustee, and he objected to the sharing of any information with plaintiff WILLIAM, while

6 | revealing he had not actually spoken to defendant IRENE, about the Alan E. Price letter from

7 | plaintiff WILLIAM. Obviously, his co-conspirator, defendant SUSAN, informed defendant

8 | DOWNES about the letter to Alan E. Price, as soon as she received her copy in the mail, and

9 | defendant DOWNES promptly swung into action and intentionally interfered with plaintiff

10 | WILLIAM'S ability to get any useful information from a neutral and knowledgeable source,

11 | Alan E. Price, through his intentional misrepresentation of material facts to Mr. Price, in

12 | deliberate bad faith. The second letter was addressed to plaintiff RUPERT, and it falsely

13 | stated the following: (1) Defendant IRENE was the trustee of The Samuel J. Rupert Trust (but

14 | not of her own Trust); (2) the accounting provisions mentioned by plaintiff WILLIAM only

15 | applied to The Samuel J. Rupert Trust; and, (3) plaintiff WILLIAM was not entitled to any

16 | reports or accounts because he was not an "income beneficiary". After making these blatantly

17 | false statements of law and fact, defendant DOWNES advised plaintiff WILLIAM he wasn't

18 | going to get any useful information from Alan E. Price, and to just sign the Modification of

19 | Trust document and return it to defendant DOWNES without further delay, because the

20 | Sword of Damocles was still over plaintiff WILLIAM'S head, poised to completely eliminate

21 | his prospective inheritance of $291,665.00. Plaintiff RUPERT was further reminded that he

22 | was not to discuss any aspects of defendant IRENE'S estate plans or financial affairs with her,

23 | but he was free to contact her and discuss any other subjects, as long as it didn't concern the

24 | new estate plans that were designed by the defendants, and each of them, to punish plaintiff

25 | WILLIAM for correctly pointing out that he was the child who was supposed to be

administering the affairs of Samuel J. Rupert, Deceased, and Irene E. Rupert, as their

successor trustee, not defendant SUSAN (with only her office store power of attorney

documents, her void *ab initio* Trust Amendment dated January 12, 2009, and most recently,

the invalid estate planning modifications she procured on or about June 10, 2009, in

conspiracy with defendant DOWNES and defendant SCHULTE  -  who aided and abetted her

fiduciary wrongdoing while furthering and enhancing her tortious conduct that amounts to

financial elder abuse against defendant IRENE, as well as continuing fiduciary breaches of

the terms of the trust, the provisions of the Oregon Uniform Trust Code (ORS Chapter 130) ,

and the Michigan Estates and Protected Individuals Code, by defendant SUSAN).

86.     On June 20, 2009, plaintiff WILLIAM received some documents in the mail

from defendant SUSAN, which were portions of the Will of Samuel J. Rupert and also certain

portions of The Samuel J. Rupert Trust. However, the all important Exhibit A, where the

assets that have been transferred to the Trust are supposed to be set forth and listed, is just a

blank document that fails to list any assets. The limited production by defendant SUSAN,

which was received on June 20, 2009, is still inadequate and insufficient, and it shows she is

still acting in bad faith, and in a despicable fashion, contrary to law.

87.     Subsequently, in late June and early July of 2009, plaintiff WILLIAM sent

additional letters to defendant SUSAN, defendant DOWNES, defendant SCHULTE, and

defendant IRENE, wherein he renewed his demands for the information he was entitled to

receive, as: (1) an income beneficiary under the terms of the trust; (2) an *interested trust*

*beneficiary* under Michigan law, whose remainder interest vested when Samuel J. Rupert died

on October 12, 2008; and/or (3) as a *qualified trust beneficiary* under Oregon law, because he

was a currently permissible distributee of discretionary principal payments from the Samuel J.

Rupert Family Trust (and a future distributee of both principal and income from the Samuel J.

Rupert Family Trust).

88.     The only response to plaintiff WILLIAM'S letters from late June and early

July of 2009 was a confused letter from defendant IRENE, wherein she blamed plaintiff

WILLIAM for the cost of the lawyer defendant SUSAN selected and convinced defendant

IRENE  she needed (defendants DOWNES & SCHULTE), so defendant IRENE could amend

her own estate planning documents in ways that weakened oversight of the administration of

her trust, when these changes are not in the best interests of defendant IRENE, and were only

designed to benefit the interests of defendant SUSAN, and defendants DOWNES &

SCHULTE.

89.     Also in early July of 2009, plaintiff WILLIAM reread the terms of The Samuel

J. Rupert Trust, which he only received from defendant SUSAN on June 20, 2009, and he

noticed that Section 12(2) explicitly states how and when a replacement trustees appointment

and acceptance becomes effective, as this section states, in pertinent part, the following:

> "Upon the death, incapacity, or resignation of a Trustee, if I have not named
>
> a successor, a Trustee shall be appointed by a majority of the income
>
> beneficiaries.  An appointment shall be in writing and shall be effective when
>
> copies of the appointment and an acceptance of trust by the replacement
>
> Trustee are delivered to any then acting Trustee and all income beneficiaries."

90.     Plaintiff WILLIAM, is one of the income beneficiaries of The Samuel J.

Rupert Trust (under the Family Trust Provisions of Section 8(D) of the terms of the trust,

according to both Michigan and Oregon law), so an effective acceptance by any replacement

trustee, following the death of Samuel J. Rupert, who was the initial trustee of his own trust,

would require that such a replacement trustee would have to deliver copies of his or her

appointment, and his or her acceptance of trust, to plaintiff WILLIAM, among others;

however, plaintiff WILLIAM has never received the required copies of her appointment and

her acceptance of trust, from defendant IRENE, whose failure to accept her appointment

within a reasonable time (9 months), represents her rejection of her appointment to fill the Office of Trustee.  Therefore, there has been a vacancy in the Office of Trustee, for the Samuel J. Rupert Trust, as Amended January 26, 2004, subsequent to his death on October 12, 2008.

91.     Defendant IRENE also manifested her rejection and/or resignation or abandonment of the Office of Trustee, for both The Samuel J. Rupert Trust and for The Irene E. Rupert Trust, by allowing defendant SUSAN to become the acting trustee and acting personal representative/executor for both The Samuel J. Rupert Trust and for The Irene E. Rupert Trust, subsequent to October 12, 2008.

92.     Because defendant SUSAN was not appointed to be the successor trustee who would succeed to the Office of Trustee (or the Office of Personal Representative), directly after the rejection, or resignation, or incapacity, or abandonment, by defendant IRENE, she has obviously not delivered copies of her appointment and acceptance of trust, for either of her parents trusts, and she will not be able to do so under any circumstances, because the 1995 and 2004 estate planning documents do not appoint her to be the next trustee, after defendant IRENE.  Moreover, defendant SUSAN'S  2008 power of attorney documents are insufficient, and the alleged June 2009 amendments to defendant IRENE'S estate plans are invalid because they were procured through defendant SUSAN'S fiduciary breaches, undue influence and fraudulent behavior, while she masqueraded as the acting trustee/personal representative/ executor *de son tort,* through her wrongful intermeddling with plaintiff WILLIAM'S entitlement to accept his appointments as the replacement trustee and the replacement personal representative (to fill the vacancies in the Office of Trustee and Office of Personal Representative, that were created by defendant IRENE'S rejection, or resignation, or incapacity, or abandonment of these Offices), with regards to both of his parents trusts and estates.

93.     Accordingly, after giving defendant SUSAN two months to produce her credentials that showed she had appointments, to succeed defendant IRENE,  which were more recent than plaintiff WILLIAM'S appointments from January 26, 2004, and her failure and refusal to do so, plaintiff WILLIAM took the necessary actions to effectively fill the vacancy in the Office of Trustee for The Samuel J. Rupert Trust, as Amended January 26, 2004, by signing a written Acceptance of Trust document, and delivering it and a copy of plaintiff WILLIAM'S appointment on January 26, 2004, to all income beneficiaries and the acting trustee.  Pursuant to Section 12(2) of the terms of the trust, plaintiff WILLIAM'S appointment to the Office of Trustee for The Samuel J. Rupert Trust, as Amended January 26, 2004, became effective on or about July 8, 2009, when copies of his appointment and his acceptance of trust were delivered to defendant IRENE, defendant SUSAN, and James Rupert (who were the interested trust beneficiaries, by virtue of being all the income beneficiaries and the acting trustee).

94.     At the same time, plaintiff WILLIAM also took the necessary actions to effectively fill the vacancy in the Office of Personal Representative, for the Estate of Samuel J. Rupert, Deceased, by signing a written Acceptance of Estate document, and delivering it and a copy of plaintiff WILLIAM'S appointment on January 26, 2004, to all interested beneficiaries and the acting personal representative.  Plaintiff WILLIAM'S appointment to the Office of Personal Representative for the Estate of Samuel J. Rupert, Deceased, also became effective on or about July 8, 2009, when copies of his appointment by Samuel J. Rupert, and his acceptance of estate, were delivered to defendant IRENE, defendant SUSAN, and James Rupert (who were the interested beneficiaries and the acting personal representative).

95.     Similarly, after giving defendant SUSAN two months to produce her credentials that showed she had appointments, to succeed defendant IRENE,  which were

more recent than plaintiff WILLIAM'S appointments from January 26, 2004, and her failure

and refusal to do so, plaintiff WILLIAM took the necessary actions to effectively fill the

vacancy in the Office of Trustee for The Irene E.. Rupert Trust, as Amended January 26,

2004, by signing a written Acceptance of Trust document, and delivering it and a copy of

plaintiff WILLIAM'S appointment on January 26, 2004, to all income beneficiaries and the

acting trustee.  Pursuant to Section 12(2) of the terms of the trust, plaintiff WILLIAM'S

appointment to the Office of Trustee for The Irene E. Rupert Trust, as Amended January 26,

2004, became effective on or about July 13, 2009, when copies of his appointment and his

acceptance of trust were delivered to defendant IRENE, defendant SUSAN, and James Rupert

(who were the interested trust beneficiaries and the acting trustee).

96.     At the same time, plaintiff WILLIAM also took the necessary actions to

effectively fill the vacancy in the Office of Personal Representative, for the Estate of Irene E.

Rupert, by signing a written Acceptance of Estate document, and delivering it and a copy of

plaintiff WILLIAM'S appointment on January 26, 2004, by defendant IRENE, to all

interested beneficiaries and the acting personal representative.  Plaintiff WILLIAM'S

appointment to the Office of Personal Representative for the Estate of Irene E. Rupert, also

became effective on or about July 13, 2009, when copies of his appointment by defendant

IRENE, and his acceptance of estate, were delivered to defendant IRENE, defendant SUSAN,

and James Rupert (who were the interested beneficiaries and the acting personal

representative).

97.     The Notices mentioned directly above, in paragraphs 93-96, also advised all

interested trust and estate beneficiaries of their affirmative obligation to turn over all relevant

assets and financial records to plaintiff WILLIAM.

98.     To date, plaintiff WILLIAM has not received any responses to his

advisements, and no assets or legitimate financial records have been provided to him by

1   defendant SUSAN, defendant IRENE, or defendants DOWNES & SCHULTE.  Instead, these

2   defendants have stonewalled all of plaintiff WILLIAM'S legitimate requests for information

3   and document production, which is greatly interfering with plaintiff WILLIAM'S ability to

4   protect his prospective inheritance interest, which is a remainder interest in 1/3 of all assets,

5   such that he is entitled to information concerning all assets.

6                            **FIRST CAUSE OF ACTION**

7            (Intentional Interference With Economic Relations (Prospective Inheritance

8                      And Lost Successor Trustee Compensation))

9                  (Against Defendants SUSAN, DOWNES and SCHULTE)

10          Plaintiff alleges as and for a First Cause of Action, as to defendants SUSAN,

11  DOWNES and SCHULTE (but not defendant IRENE):

12          99.     Plaintiff hereby incorporates paragraphs 1-98 of the General Allegations as

13  though fully set forth at length herein.

14          100.    Defendants SUSAN, DOWNES and SCHULTE, and each of them, were fully

15  aware of Samuel J. Rupert and defendant IRENE'S estate planning documents, as created on

16  November 1, 1995 and amended on January 26, 2004, and the fact that plaintiff WILLIAM

17  stood to inherit one-third of Trust and Estate assets valued at $874,995.00, or $291,665.00, as

18  of March 31, 2009, according to defendant SUSAN'S own financial report (Quarterly

19  Account), of that date.  Defendants SUSAN, DOWNES and SCHULTE, and each of them,

20  were also aware that plaintiff WILLIAM was the first nominated child of Samuel J. Rupert

21  and defendant IRENE who was supposed to have the first opportunity to accept his

22  appointment and serve as the successor trustee of their respective estates and trusts, when it

23  was time for them to relinquish control to one of the children, and this opportunity would

24  entitle the successor trustee to compensation equal to the compensation of a corporate

25  fiduciary managing $874,995.00 in assets.

101. Defendants SUSAN, DOWNES and SCHULTE, and each of them, intentionally interfered with plaintiff WILLIAM'S relationship with his Mother, defendant IRENE, and his economic relations, relative to hers' and her late husband's Estate and Trust assets (prospective inheritance), through wrongful conduct that was not privileged. Additionally, defendants SUSAN, DOWNES and SCHULTE, and each of them, intentionally interfered with plaintiff WILLIAM'S successor trustee compensation opportunities (whereby he could have been compensated as if he was a corporate fiduciary managing $874, 995.00 in assets, possibly for years), following the untimely death of Samuel J. Rupert on October 12, 2008. The intentional interference by defendant SUSAN started shortly after the death of Samuel J. Rupert, when she seized control over all estate planning documents and discovered the January 26, 2004 estate planning modifications that entitled plaintiff WILLIAM to be the sole successor trustee, without immediately relinquishing control, and all estate planning documents and financial records to plaintiff WILLIAM. Defendant SUSAN'S intentional interference continues, unabated, to the present time. The intentional interference by defendant DOWNES and defendant SCHULTE commenced on or about May 20, 2009, and also continues, unabated, to the present time.

102. Plaintiff WILLIAM'S economic relationship with Samuel J. Rupert and defendant IRENE concerned only him and his parents, such that Defendants SUSAN, DOWNES and SCHULTE, and each of them, were outsiders and third parties who had no right to tamper and wrongfully interfere with plaintiff WILLIAM'S economic relations with defendant IRENE , with the Estate of Samuel J. Rupert, Deceased, and with The Samuel J. Rupert Family Trust, which appears to have been wrongfully drained of assets in the neighborhood of $500,000.00, over the last 9 months (based upon defendants DOWNES & SCHULTE'S June 10, 2009 statement that, "Your mother's trust will have substantially all he family assets in it, except for less than $100,000, which is in your father's trust."

103.    By wrongfully draining The Samuel J. Rupert Family Trust of roughly $500,000.00 in assets, in violation of the terms of the trust, defendants SUSAN, DOWNES and SCHULTE, and each of them, are hedging their bets, in case their scheme to squeeze out plaintiff WILLIAM is only successful with regards to defendant IRENE'S trust and estate. In case they are not successful in squeezing out plaintiff WILLIAM from the now irrevocable Samuel J. Rupert Family Trust, as Amended January 26, 2004, they are wrongfully looting the assets of the Family Trust (and shifting these assets to the trust of defendant IRENE, because they know they can squeeze plaintiff WILLIAM out of defendant IRENE'S estate and trust, and cause his complete disinheritance by defendant IRENE), in order to wrongfully interfere with plaintiff WILLIAM'S vested remainder interest, which entitles him to 1/3 of the assets belonging to the now irrevocable Family Trust. By wrongfully reducing the assets of the Family Trust, defendants SUSAN, DOWNES and SCHULTE are also wrongfully reducing the compensation plaintiff WILLIAM could earn by being compensated as if he was a corporate fiduciary, because corporate fiduciaries are paid according to the value of the assets they are managing.

104.    Defendants SUSAN, DOWNES and SCHULTE, and each of them, are also exposing defendant IRENE to an unreasonable level of risk and liability, because under Michigan law, which governs the now irrevocable Family Trust which was created by Samuel J. Rupert, Deceased, defendant IRENE could be ordered to pay back *double* the amount of the assets which were embezzled, or wrongfully appropriated, on her behalf, from the Family Trust, by defendants SUSAN, DOWNES and SCHULTE.

105.    Defendants SUSAN, DOWNES and SCHULTE, and each of them, accomplished their interference through improper means. In the case of defendant SUSAN, the improper means were to exert undue influence upon defendant IRENE that caused her to drastically modify her estate planning documents, in ways that only benefited defendant

SUSAN. The undue influence is shown by the following factors: (1) defendant SUSAN had *a confidential relationship* with defendant IRENE , by virtue of her two (2) power of attorney documents; (2) defendant SUSAN had a *position of dominance* over her, which became even more dominant after the October 12, 2008 death of Samuel J. Rupert, and even more dominant still after the eruption of the current controversy on May 11, 2009; and, (3) all the *suspicious circumstances* necessary to invoke the presumption of undue influence under Oregon law are present in this case, because: (a) Defendant SUSAN was *active in the procurement* of the drastic modifications defendant IRENE allegedly made to her Trust on or about June 10, 2009; (b) Defendant SUSAN selected the lawyer who made the drastic modifications on or about June 10, 2009, and defendant IRENE had *no opportunity for independent advice* from an attorney of her own choosing; (c) The drastic modifications on or about June 10, 2009 were cloaked in *secrecy and haste*, as shown by the fact that defendant SUSAN continues to stonewall and conceal relevant documents, assets and financial records; and plaintiff WILLIAM was taken by complete surprise when he was first informed about the drastic modifications that had already been made, behind his back and without his knowledge; (d) Along with the drastic modifications on or about June 10, 2009, defendant IRENE developed a completely negative and *changed attitude towards plaintiff WILLIAM*, who is now shunned within the family, unlike the positive attitude and good relations that existed up until May 11, 2009; (e) The drastic modifications on or about June 10, 2009 represent enormous philosophical *changes in the estate plans*, by changing the successor trustee from plaintiff WILLIAM to defendant SUSAN, by eliminating the open and transparent accounting provisions, and by adding draconian no contest clauses that can be triggered by any objection to the administration of the trust, by defendant SUSAN - as the open provisions of the Family Trust, that was designed by Samuel J. Rupert, have been turned into the Fascist Trust, where any criticism of defendant SUSAN will result in complete and total

1    disinheritance; (f) The drastic modifications on or about June 10, 2009 represent **unnatural**

2    **or unjust gifts**, because there is no valid justification or basis for punishing plaintiff

3    WILLIAM, as if he has done something wrong or improper, and his disinheritance will result

4    in unjust windfalls for defendant SUSAN and James Rupert; and, (g) **defendant IRENE was,**

5    **and is, extremely susceptible to the dominant influence exerted by defendant SUSAN**,

6    because she is a 90 year old, grief stricken, emotionally upset and confused, woman who

7    suffers from Alzheimer's Disease, who cannot understand or remember even simple

8    amendments to her estate planning documents, as conceded by defendant SUSAN'S own e-

9    mail to plaintiff WILLIAM on January 13, 2009. The improper means of defendant

10    DOWNES and defendant SCHULTE consists of exploiting a woman who lacks testamentary

11    capacity, because she is no longer of sound mind, to drastically modify her estate planning

12    documents by having her sign documents she does not fully comprehend or understand, that

13    are not truly in her best interests. For instance, the proposed consent Modification of Trust

14    document they tried to extort plaintiff WILLIAM into signing by June 19, 2009, with regards

15    to the now irrevocable Samuel J. Rupert Family Trust, included a number of changes that

16    were not in defendant IRENE'S best interest. More specifically, the proposed modification

17    would have eliminated her as the sole current income beneficiary, and it also contained no

18    provisions for the payment of any principal to her. Instead, the proposed modifications

19    simply referred to defendant IRENE as the "primary beneficiary" (which has no intrinsic legal

20    meaning), without specifying what type of payments, if any, that status would entitle

21    defendant IRENE to receive. The original terms of the trust included definite standards of

22    support which were to be followed, and a clear statement of purpose for the Family Trust.

23    However, the proposed modifications eliminated all these standards, in favor of the Fascist

24    Trust, where defendant SUSAN is granted the sole and unbridled discretion to do whatever

25    she wants to do, whenever she wants to do it, with both the income and the principal, of the

1 | trust.

2 |      106.    Defendants SUSAN, DOWNES and SCHULTE, and each of them,

3 | additionally accomplished their interference for improper purposes (to go along with their

4 | utilization of improper means). One of the improper purposes of defendant SUSAN was to

5 | retain her control of the administration of both parents assets, even though the estate planning

6 | documents in existence when Samuel J. Rupert died on October 12, 2008, and on May 20,

7 | 2009 when she first consulted with defendant DOWNES and defendant SCHULTE, clearly

8 | showed that the proper and lawful successor trustee was supposed to be plaintiff WILLIAM,

9 | once defendant IRENE relinquished control of all matters, as she did after October 12, 2008.

10 | Another improper purpose by defendant SUSAN was to avoid having to account for her

11 | actions as the administrator of both parents' Trusts, since October 12, 2008. Yet another

12 | improper purpose by defendant SUSAN was to turn an open and transparent trust, without any

13 | no contest clauses, into a closed and secretive agreement, with draconian no contest clauses

14 | that could be triggered by mere objections to the administration of the trust (as opposed to a

15 | challenge to the underlying provisions of a Trust Agreement, which is the normal conduct that

16 | triggers a no contest clause).. The last improper purpose of defendant SUSAN was to unfairly

17 | punish plaintiff WILLIAM by cheating him out of his prospective inheritance and his

18 | prospective successor trustee compensation, so she could benefit financially from his loss, and

19 | otherwise within the family structure, by diminishing the stature of plaintiff WILLIAM,

20 | within his own family, as if he had done something wrong. The improper purposes of

21 | defendant DOWNES and defendant SCHULTE, were to conceal, maintain, and further

22 | defendant SUSAN'S breaches of her fiduciary duties towards plaintiff WILLIAM (based

23 | upon defendant SUSAN'S performance and conduct as the acting trustee *de son tort* for both

24 | her parents' Trusts), and to circumvent the laws of the State of Michigan and Oregon that do

25 | not permit the type of fiduciary misconduct defendant SUSAN has engaged in, and which do

1  not permit estate planning documents to be executed by people who are not of sound mind,

2  and which do not permit the involuntary removal of a successor trustee, without cause, or

3  before being given an opportunity to function in that capacity. Another of the improper

4  purposes of defendant DOWNES and defendant SCHULTE, was to utilize economic

5  compulsion, and the threat of unjustified financial damages to extort plaintiff WILLIAM into

6  signing a Modification of Trust agreement, which would remove him as successor trustee of

7  The Samuel J. Rupert Trust, and replace him with defendant SUSAN as successor trustee (in

8  addition to also agreeing that he could never, ever, be the successor trustee).

9     107.    But for the intentional interference set forth above, defendant IRENE would

10  not have reduced plaintiff WILLIAM'S inheritance share, or disinherited him in any way, and

11  plaintiff WILLIAM would have had the opportunity to function as the successor trustee for

12  both of his parents, which would have given him the opportunity to be compensated, possibly

13  for years, as if he was a corporate fiduciary managing $874,995.00 in assets.

14     108.    Defendants SUSAN, DOWNES and SCHULTE, and each of them, have

15  inflicted damages upon plaintiff WILLIAM that are estimated to be in excess of $300,000.00

16  (wrongful disinheritance damages of $291,665.00, plus lost successor trustee compensation

17  since October 12, 2008, which could have continued for years into the future).

18     WHEREFORE, plaintiff prays for judgment against the defendants named in this

19  cause of action, defendants SUSAN, DOWNES and SCHULTE, as hereinafter set forth.

20

21  **SECOND CAUSE OF ACTION**

22  (Conspiracy To Interfere With Economic Relations - By Squeezing Out The Plaintiff,

23  As Both The Successor Trustee And As A Beneficiary, And/Or By Looting The Assets Of

24  The Samuel J. Rupert Family Trust, Through Unlawful And Improper Means)

25  (Against Defendants SUSAN, DOWNES and SCHULTE)

109.     Plaintiff hereby incorporates paragraphs 1-98 of the General Allegations, and paragraphs 99-108 of the First Cause of Action, as though fully set forth at length herein.

110.     Defendants SUSAN, DOWNES and SCHULTE, and each of them, by late May or early June of 2009, had full knowledge of the following circumstances: (1) defendant IRENE was suffering from Alzheimer's Disease, and she had memory problems, such that she lacked testamentary capacity because she was no longer of "sound mind"; (2) defendant SUSAN commenced functioning and performing as if she was the proper successor trustee/executor, or administrator, of both of her parents' Trusts and Estates on October 12, 2008, immediately upon the death of Samuel J. Rupert; (3) defendant IRENE willingly relinquished and abandoned all control to defendant SUSAN, after the death of Samuel J. Rupert, and never indicated the desire, or ability, to function as either her own trustee or as the successor trustee of the Samuel J. Rupert Trust; (4)  the relevant estate planning documents which were in existence when this dispute first arose on May 11, 2009, and when defendant SUSAN and defendant IRENE first contacted defendant DOWNES and defendant SCHULTE, clearly establish that plaintiff WILLIAM is the first nominated child who is supposed to be given the opportunity to accept his appointment to the Office of Trustee; (5) although defendant SUSAN had only been the acting trustee *de son tort*, and not the legal successor trustee, her fraudulent acceptance and actual performance as the successor trustee of the Trusts gave her fiduciary obligations towards all named beneficiaries of the Trusts, including plaintiff WILLIAM;  (6) defendant SUSAN was in breach of the terms of the trust (as amended in 2004), and had an affirmative fiduciary obligation and duty to turn over all estate planning documents and financial records to plaintiff WILLIAM, as well as a duty to turn over all management control and the administration of both Trusts (and the Estate of Samuel J. Rupert), to plaintiff WILLIAM.

///

111. The co-conspirators, or joint tortfeasors, in this case are defendant BOND, and defendant DOWNES and defendant SCHULTE. Commencing on or about May 20, 2009, these defendants agreed to collaborate for the common purpose of damaging plaintiff WILLIAM by squeezing him out of the role of successor trustee and also as a beneficiary, to the greatest extent possible, so that defendants SUSAN, DOWNES and SCHULTE could benefit financially, and so that defendant SUSAN could breach her fiduciary obligations to plaintiff WILLIAM, instead of honoring them.

112. Defendants SUSAN, DOWNES and SCHULTE, and each of them, had a meeting of the minds, sometime after May 20, 2009, that they would extinguish plaintiff WILLIAM'S prospective inheritance rights, to the greatest extent possible, and his chances to ever perform as the successor trustee, by taking advantage of defendant IRENE'S lack of testamentary capacity, and defendant SUSAN'S position of dominance over her, to exert undue influence upon defendant IRENE and fraudulently trick her into thinking she needed to execute new, and drastically different estate planning documents, that squeezed out plaintiff WILLIAM, as a successor trustee (by falsely suggesting plaintiff WILLIAM'S intentions were to make unwise and risky investments in junk bonds, and not act prudently, if allowed to function as the successor trustee), and as a beneficiary, and which rewarded defendant SUSAN with the successor trustee role, an increased inheritance share, and unbridled discretion to do whatever she wanted to do, whenever she wanted to do it, with the income and principal of the trust belonging to defendant IRENE. The new, and drastically different estate planning documents also benefited defendant DOWNES and defendant SCHULTE, because of the unnecessary and exorbitant legal fees they were able to generate by having their alleged client, defendant IRENE, execute new, and drastically different estate planning documents when she was not "of sound mind", and the new, and drastically different estate planning documents were entirely unnecessary and not in her best interests, and these new,

and drastically different estate planning documents were illegal and prohibited under both

Michigan and Oregon law (due to defendant IRENE'S lack of a "sound mind", and the undue

influence utilized by defendant SUSAN to procure these new documents). The new, and

drastically different estate planning documents that were signed by defendant IRENE were

against her own best interests (because the new plans changed an open and transparent

accounting provisions, that required full disclosure throughout the family, to a closed and

secretive administration, with draconian no contest clauses that would permit defendant

SUSAN to breach the terms of the trust with impunity), and therefore outside the traditional

attorney-client relationship, such that the conduct by defendant DOWNES and defendant

SCHULTE is not privileged, in this case. Although defendant DOWNES and defendant

SCHULTE pretended to be representing defendant IRENE (as trustee), they simply exploited

her to advance the interests of defendant SUSAN, and themselves (at the expense of plaintiff

WILLIAM and defendant IRENE). What they did was not the practice of law, it was fraud,

and committing frauds, or aiding and abetting fraudulent behavior by a fiduciary, such as the

fraudulent behavior and financial elder abuse by defendant SUSAN in this case, is not

privileged conduct.

113. But for the conspiratorial conduct and intentional interference set forth above,

defendant IRENE would not have reduced plaintiff WILLIAM'S inheritance share, or

disinherited him in any way, and plaintiff WILLIAM would have had the opportunity to

function as the successor trustee for both of his parents, which would have given him the

opportunity to be compensated, possibly for years, as if he was a corporate fiduciary

managing $874,995.00 in assets.

114. Defendants SUSAN, DOWNES and SCHULTE, and each of them, as co-

conspirators and joint tortfeasors, have inflicted damages upon plaintiff WILLIAM that are

estimated to be in excess of $300,000.00 (wrongful disinheritance damages of $291,665.00,

1 | plus lost successor trustee compensation since October 12, 2008, which could have continued

2 | for years into the future).

3 |     WHEREFORE, plaintiff prays for judgment against the defendants named in this

4 | cause of action, defendants SUSAN, DOWNES and SCHULTE, as hereinafter set forth

5 |

6 |     ### THIRD CAUSE OF ACTION

7 |     (Punitive Damages)

8 |     (Against defendant SUSAN and defendant DOWNES)

9 |     115.    Plaintiff hereby incorporates paragraphs 1-98 of the General Allegations,

10 | paragraphs 99-108 of the First Cause of Action, and paragraphs 109-114, of the Second Cause

11 | of Action, as though fully set forth at length herein.

12 |     116.    Defendant SUSAN and defendant DOWNES did not inadvertently harm

13 | plaintiff WILLIAM, they did it intentionally and deliberately, through malicious, oppressive

14 | and fraudulent behavior that is unacceptable in a civilized society, such that they should have

15 | punitive damages assessed against them, in an amount to be decided by the Court (or by the

16 | jury, if one is requested by the defendants), commensurate with their despicable behavior in

17 | this case, so as to make an example of them and deter others from engaging is such egregious

18 | and despicable behavior, that amounts to financial elder abuse..

19 |     WHEREFORE, plaintiff prays for judgment against the defendants named in this

20 | cause of action, as hereinafter set forth

21 |

22 |     ### FOURTH CAUSE OF ACTION

23 |     (Declaratory Relief)

24 |     (Against All Defendants, IRENE, SUSAN, DOWNES and SCHULTE)

25 |

117. Plaintiff hereby incorporates paragraphs 1-98 of the General Allegations, paragraphs 99-108 of the First Cause of Action, and paragraphs 109-114, of the Second Cause of Action, and paragraphs 115-116 of the Third Cause of Action, as though fully set forth at length herein.

118. There is currently a case of actual controversy, between plaintiff WILLIAM and defendants IRENE, SUSAN, DOWNES and SCHULTE, concerning the rights and other legal relations of plaintiff WILLIAM, with regards to the Estate and Trust of Samuel J. Rupert, Deceased and the Estate and Trust of defendant IRENE.

119. More specifically, there is currently an actual controversy among the parties to this action concerning whether or not plaintiff WILLIAM has been entitled to the notices, rights and privileges of an "income beneficiary" as that term is defined under Michigan and/or under Oregon law, with regards to the trusts of Samuel J. Rupert and defendant IRENE. Plaintiff WILLIAM contends he is entitled to be regarded as an income beneficiary, whereas all defendants contend otherwise. Plaintiff seeks a declaration that he is entitled to all the rights and privileges of an income beneficiary, with regards to both Trusts, in this case.

120. There is also currently an actual controversy among the parties to this action concerning whether or not plaintiff WILLIAM is entitled to any information concerning the assets and administration of his parents' Trusts, from the acting trustee *de son tort,* defendant SUSAN (or anyone else), concerning the administration subsequent to the death of Samuel J. Rupert on October 12, 2004. Plaintiff WILLIAM contends he is entitled to asset and administration information based upon his status as an "interested trust beneficiary", a "vested remainder beneficiary", and an "income beneficiary", under Michigan law; and/or as a "qualified trust beneficiary" and an "income beneficiary" under Oregon law; whereas all defendants contend otherwise. Plaintiff seeks a declaration that he is entitled to the information he has sought from the defendants concerning the assets and administration of his

1   parents' Trusts, subsequent to the death of Samuel J. Rupert on October 12, 2008.

2       121.   Yet another current controversy among the parties herein concerns whether or

3   not defendant IRENE relinquished, abandoned, resigned or rejected the Office of Trustee for

4   her own trust and for The Samuel J. Rupert Trust, as Amended January 26, 2004, by allowing

5   defendant SUSAN to become the acting trustee *de son tort*, with regards to both Trusts, and

6   by failing to accept her appointment to the Office of Trustee, by Samuel J. Rupert within a

7   reasonable time after his death on October 12, 2008.  Plaintiff WILLIAM contends defendant

8   IRENE has relinquished, abandoned, resigned or rejected the Office of Trustee for her own

9   trust and for The Samuel J. Rupert Trust, as Amended January 26, 2004, whereas all

10  defendants contend otherwise.  Plaintiff seeks a declaration that defendant IRENE

11  relinquished, abandoned, resigned or rejected the Office of Trustee for her own trust and for

12  The Samuel J. Rupert Trust, as Amended January 26, 2004, such that there was a vacancy in

13  the Office of Trustee, for both Trusts, until July 8, 2009 and July 13, 2009, when plaintiff

14  WILLIAM'S appointments and acceptances of trust, for his parents' Trusts, became effective,

15  pursuant to Section 12(2) of the terms of the trust.

16      122.   Another current controversy among the parties herein concerns whether or not

17  defendant IRENE relinquished, abandoned, resigned or rejected the Office of Personal

18  Representative for her own Estate and for The Estate of Samuel J. Rupert, Deceased, by

19  allowing defendant SUSAN to become the acting executor/personal representative *de son tort*,

20  with regards to both Estates, and by failing to accept her appointment to the Office of

21  Personal Representative, by Samuel J. Rupert within a reasonable time after his death on

22  October 12, 2008.  Plaintiff WILLIAM contends defendant IRENE has relinquished,

23  abandoned, resigned or rejected the Office of Personal Representative for her own Estate and

24  for The Estate of Samuel J. Rupert, Deceased, whereas all defendants contend otherwise.

25  Plaintiff seeks a declaration that defendant IRENE relinquished, abandoned, resigned or

1  rejected the Office of Personal Representative for her own Estate and for The Estate of

2  Samuel J. Rupert, Deceased, such that there was a vacancy in the Office of Personal

3  Representative, for both Estates, until July 8, 2009 and July 13, 2009, when plaintiff

4  WILLIAM'S appointments and acceptances of Estate, for his parents' Estates, became

5  effective, as a matter of law.

6      123.    An additional current controversy among the parties herein concerns whether

7  defendant SUSAN performance as the acting trustee, and acting personal representative, for

8  both of her parents' Trusts and Estates, subsequent to October 12, 2008, was proper and

9  lawful, or improper and illegal under the circumstances of this case. Plaintiff WILLIAM

10  contends her performance as the acting trustee and acting personal representative was

11  improper and illegal, while the defendants contend otherwise. Plaintiff seeks a declaration

12  that defendant SUSAN wrongfully intermeddled with her parents estate plans, by purporting

13  to accept the Office of Trustee and the Office of Personal Representative, without any valid or

14  legitimate appointment to such office, such that she only became the acting trustee/personal

15  representative *de son tort*.

16      124.    Yet another current controversy among the parties herein concerns whether,

17  under the specific circumstances of this case, the assets of the Estate of Samuel J. Rupert and

18  of The Samuel J. Rupert Trust, as Amended January 26, 2004, are required to be allocated to

19  The Samuel J. Rupert Family Trust, as plaintiff WILLIAM contends, based upon his reading

20  of the terms of the trust. Or, as all the defendants contend, can these assets be freely

21  transferred and conveyed to the Estate and Trust of defendant IRENE, so as to deprive

22  plaintiff WILLIAM of a substantial portion of his vested remainder interest in the Family

23  Trust assets. Plaintiff WILLIAM seeks a declaration that none of the Family Trust assets can

24  properly or legally be transferred from the Family Trust, to the Estate or Trust of defendant

25  IRENE, without breaching the terms of the trust for The Samuel J. Rupert Family Trust.

125. There is also a current controversy among the parties concerning the legal effectiveness of defendant SUSAN'S amendment to The Irene E. Rupert Trust, dated January 12, 2009, wherein defendant SUSAN purported to amend defendant IRENE'S trust to name herself as the sole successor trustee. The plaintiff WILLIAM contends this amendment by defendant SUSAN is prohibited by Oregon law, such that it is void *ab initio*, and wholly ineffective; whereas the defendants contend otherwise. Plaintiff WILLIAM seeks a determination that the amendment by defendant SUSAN, dated January 12, 2009, is a legal nullity, and of no force or effect.

126. Additionally, there is a current controversy concerns the alleged amendments to her estate plans, by defendant IRENE, on or about June 10, 2009. Plaintiff WILLIAM contends these amended estate planning documents are all invalid, and legally ineffective, because they were only procured through fraudulent behavior and the use of undue influence, by the defendants herein, against defendant IRENE, who was tricked into amending her estate plans in ways that are not in her best interests. All defendants, on the other hand, contend otherwise, and they all contend defendant IRENE'S new estate plans are perfectly legal and appropriate, and she was of a sound mind when she executed them. Plaintiff seeks a declaration that the June, 2009 estate plans by defendant IRENE, are invalid because they were only procured through fraudulent behavior and the utilization of undue influence, by defendant SUSAN (in conspiracy with defendants DOWNES & SCHULTE), against defendant IRENE, which overcame her free will and caused her to sign estate planning documents that are not in her best interests.

WHEREFORE, plaintiff prays for judgment against the defendants named in this cause of action, as hereinafter set forth.

///

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment against defendants as hereinafter set forth.

1.   For a money judgment for damages in excess of $300,000.00, according to proof, together with interest on said amounts, against defendant SUSAN, defendant DOWNES, and defendant SCHULTE;

2.   For a money judgment that is against defendants SUSAN, DOWNES and SCHULTE, as co-conspirators and joint tortfeasors, for which they are all jointly and severally liable;

3.   For additional punitive damages against defendant SUSAN and defendant DOWNES, for their despicable behavior, in an amount to be determined by the Court (or Jury, if demanded by defendants);

4.   For a Declaratory Judgment establishing the following rights and legal relations among the parties hereto:

    A.   Plaintiff WILLIAM is entitled to all the rights and privileges of an income beneficiary, with regards to both Trusts, in this case;

    B.   Plaintiff WILLIAM is entitled to the information he has sought from the defendants, concerning the assets and administration of his parents' Trusts and Estates, subsequent to the death of Samuel J. Rupert on October 12, 2008;

    C.   Defendant IRENE relinquished, abandoned, resigned or rejected the Office of Trustee for her own trust and for The Samuel J. Rupert Trust, as Amended 1/26/04, such that there was a

vacancy in the Office of Trustee, for both Trusts, until July 8, 2009 and July 13, 2009, when plaintiff WILLIAM'S appointments and acceptances of trust, for his parents' Trusts, became effective, pursuant to Section 12(2) of the terms of the trust;

D.     Defendant IRENE relinquished, abandoned, resigned or rejected the Office of Personal Representative for her own Estate and for The Estate of Samuel J. Rupert, Deceased, such that there was a vacancy in the Office of Personal Representative, for both Estates, until July 8, 2009 and July 13, 2009, when plaintiff WILLIAM'S appointments and acceptances of Estate, for his parents' Estates, became effective, as a matter of law;

E.     Defendant SUSAN wrongfully intermeddled with her parents estate plans, by purporting to accept the Office of Trustee and the Office of Personal Representative, without any valid or legitimate appointment to such offices, such that she only became the acting trustee/personal representative *de son tort;*

F.     None of the assets that are supposed to be allocated to The Samuel J. Rupert Family Trust can properly or legally be transferred or distributed from the Family Trust, to the Estate or Trust of defendant IRENE, without breaching the terms of the trust for The Samuel J. Rupert Family Trust;

G.     The purported amendment by defendant SUSAN, to The Irene E. Rupert Trust, dated January 12, 2009, is void *ab initio,* and a legal nullity which is of no force or effect;

H.   The alleged June, 2009 estate plans by defendant IRENE, are invalid, illegal and unenforceable, because they were only procured through fraudulent behavior, fiduciary breaches, and the utilization of undue influence, by defendant SUSAN (in conspiracy with defendants DOWNES & SCHULTE), against defendant IRENE, which overcame her free will and caused her to sign estate planning documents that are clearly not in her own best interests;

5.   For costs of suit incurred; and

6.   For such other relief as is just and proper.

Dated:  July 22, 2009

By:   *William T. Rupert*

WILLIAM T. RUPERT
Plaintiff    Pro Se
P.O. Box 66403, Scotts Valley, CA 95067-6403
emfwtr@comcast.net
(831) 336-9520